[Crim. No. 379.   Third Appellate District.—September 20, 1917.]

THE PEOPLE, Respondent, v. HENRY LEE, Appellant.

CRIMINAL LAW — MURDER — ARGUMENT OF DISTRICT ATTORNEY—STATEMENTS CONCERNING REASONABLE DOUBT—LACK OF PREJUDICE.—In a prosecution for murder, statements made by the district attorney in his argument to the jury as to the meaning of reasonable doubt are harmless where, upon attention called thereto, he advised the jury to follow the instructions of the court and not take his statements on the subject.

ID. — IMPOSSIBILITY OF PROCURING WITNESSES TO KILLING — LACK OF PREJUDICE.—In a prosecution for murder committed by a member of a Chinese secret society, the statement by the district attorney in his argument to the jury of the impossibility of the prosecution to get any Chinese witness to testify to the killing was not prejudicial where, upon objection being made, the court instructed the jury to disregard the remark.

ID. — MANUFACTURE OF TESTIMONY BY WITNESS — MISCONDUCT NOT REVERSIBLE ERROR.—In such a prosecution, the statement of the district attorney in argument to the jury that a witness had assisted in manufacturing testimony for the defense is not reversible error where the court remarked that no evidence to that effect had been introduced, and admonished the jury to disregard the statement.

ID.—EVIDENCE—FLIGHT OF CODEFENDANT.—In such a prosecution, evidence of the flight of the party informed against jointly with the defendant is harmless error where the defendant admitted his own attempt at flight.

ID.—JUSTIFICATION OF KILLING—INSTRUCTION—THREATS AGAINST DECEASED NOT ELIMINATED FROM CONSIDERATION.—An instruction that in determining whether defendant acted as a reasonable person upon the appearances as they were presented to him, the test is what such defendant had reasonable cause to believe, and did believe, as a reasonable person at the time of the killing, and not what subsequent events may have proved the actual situation to have been, did not have the effect of withdrawing from the consideration of the jury threats made by deceased against the defendant.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order denying a new trial. John Hancock, Judge Presiding.

The facts are stated in the opinion of the court.

A. H. Ashley, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

BURNETT, J.—Defendant was informed against jointly with one Ah Wing for the murder of one Lee Yow Juck. The parties were all Chinamen, and the homicide occurred on February 11, 1916, on Washington Street, in Stockton, in Chinatown of that city. There is ample evidence found in the testimony of white witnesses to show that deceased was crossing Washington Street from one side to the other, when defendant and the codefendant came out, observed him, and each fired several shots into the body of the deceased. The deceased was attempting, during this time, to escape, and when on the south side of the street he dropped to the ground, and defendant being near him, reached over and fired two shots into his temple. Ah Wing also shot the deceased while he was lying on the ground. The two defendants then dropped their pistols and began running to get away. They attempted to escape but were pursued by officers, and, after running a short distance, each of them was apprehended. Eleven shots took effect in the body of the deceased, and caused his immediate death. The evidence of the prosecution shows a clear case of murder, deliberately executed, meriting, it might well be said, the extreme penalty of the law. Indeed, the case is so clear and convincing and satisfactory that the recent amendment to the Constitution, section 4½ of article VI, might well be invoked in the consideration of all of the points made by appellant upon which he bases his contention for a reversal of the judgment. Indeed, it is quite likely that if the cause for any reason should be reversed, its history might furnish a duplicate of the case of *People* v. *Grill,* 3 Cal. App. 514, [86 Pac. 613], wherein the verdict rendered by the jury found the defendant guilty of murder in the first degree and fixed the penalty at imprisonment for life. The cause was reversed on account of an erroneous instruction, and upon a retrial the defendant was convicted of murder in the first degree carrying with it the penalty of death. This judgment was affirmed by the supreme court (151 Cal. 592, [91 Pac. 515]), and the defendant thereafter executed.

Even the testimony of defendant in the case at bar nega-
tives the contention of self-defense and shows the killing to
have been deliberate, premeditated, and malicious. We may
give a portion of his testimony, giving it in the narrative
form. After stating that he saw deceased put his hand in
his pocket and that Ah Wing was standing alongside of de-
fendant, he proceeded: "I didn't see him take his hand out
of his pocket and I fired and shot at him. He was facing
me then a little to one side, and as soon as I fired the first
shot he turned around. Then he started to run across the
street. I went after him, shooting. I was shooting at his
person. After he turned around I was shooting at his back.
I don't know how many times. I don't know whether he had
his hand in or out of his pocket; I didn't see that. He had
his hand in his pocket; I couldn't tell what he had. When
he was running across the street and I was running after
him, I was about three or four feet from him. Juck didn't
turn around any more at all. He fell down after he got
across the street. When I was running across to Juck, Ah
Wing was on one side of me, and he was shooting into
Juck's back, too. After we got across the street, Juck fell
on the sidewalk. I shot him after he was down. I don't
know how many shots I fired then. I was bending over a
little when I shot him in the head." He further testified that
after emptying his pistol, he threw the weapon away and
tried to escape. It is true that in his testimony he claimed
he believed that his life was in danger, but his recital of the
facts must have convinced the jury, as it would any fair-
minded man, that he had no reason to believe, and did not
believe, that his life was in danger, and that his plea of self-
defense was a mere subterfuge without any real foundation
for its support. In fact, in view of the record, it must have
taxed the ingenuity of the able counsel of appellant to pre-
sent to the jury a plausible argument that there was any
excuse or justification for the homicide. So we repeat that if
there ever was a case where a reversal for errors committed
during the trial would work a miscarriage of justice, such is
the case before us.

We have, however, examined with some care the various as-
signments of error made by appellant, and while we are
inclined to the view that some of the rulings of the court
were erroneous, yet none of them is of sufficient importance

to demand more than passing notice, and certainly there is nothing of error sufficiently grave, as shown by the record, to warrant a reversal of the conviction, based, as it is, upon indisputable proof of the defendant's guilt.

The point upon which appellant seems to dwell most earnestly relates to the conduct of the district attorney. It is claimed that he overstepped the bounds of legitimate argument in his address to the jury, and that he sought to introduce improper evidence to the prejudice of the defendant. We deem it unnecessary to notice all the specifications in that particular. One objection to the district attorney's argument to the jury was directed to his statements as to the doctrine of reasonable doubt, as follows: "The law is for the court. But sometimes jurymen may think that there is some artificial rule that they must follow, something more than is reasonable, to believe it beyond a reasonable doubt. I think just the common-sense rule that you believe it now, and are satisfied, and fully conscientious, and not wishing to do any harm, and not wishing to find him guilty unless he is guilty, and you know the consequences of a thing like that, then it is for you, gentlemen of the jury, to find out if you believe beyond a reasonable doubt, and without any artificial rules or any confusion in your understanding of what the definition of reasonable doubt means." Upon his attention being called to this statement, the district attorney added: "As I stated before beginning, what I have said here is for the purpose of illustration only. You listen to the instructions of the court and determine from them and not what I say." We can see no merit in the criticism of these statements made by the district attorney. It may be that his effort did not result in making any clearer in the minds of the jury the generally accepted definition of reasonable doubt, but it certainly did no harm, and any possible prejudicial impression was removed by the direction of the district attorney to follow the instructions of the court.

In commenting upon the incidents connected with the homicide, the district attorney said: "You may imagine why the testimony is all one way. Thirty or forty Chinamen along there saw the shooting. I do not see any of them in court telling about it, either for the defense or the prosecution. Do you suppose, gentlemen of the jury, that the prosecution

could get any Chinaman in Stockton to come up here and testify that they saw Wing and Lee shoot Juck?" Upon objection being made to this statement, the court directed the jury to disregard the remark of the district attorney and to strike it from their minds. Said statement of the prosecuting officer was probably within the range of legitimate argument, but at any rate we must assume that the jury followed the admonition of the court to disregard the statement. Again the district attorney said: "If a murder like this was committed on the streets of Stockton, in the presence of five white men—I believe four officers—and the man caught red-handed in the act, and then a proposition of his defense like this is staged, and if they can get away with it, if they can save the man on a thing of that kind, gentlemen of the jury, hadn't the people of the state of California just as well bow down to the power and influence of the Suey Sings?" This was assigned as error, and the court was asked to instruct the jury to disregard it. "The Court: Let the exception be noted. Proceed, Mr. Foltz." We do not think that the court was required to direct the jury to disregard it. We think it was a rational inference that the "Suey Sings" had interested themselves in the defense of appellant, but at any rate it was a matter of such trivial importance as not to justify a reversal of the case even if such remarks of the district attorney were to be deemed improper. The appellant also complains bitterly of the statement of the district attorney that one Ahtye had manufactured the defense in the case. The language of the district attorney was: "Say, gentlemen of the jury, to Mr. Ahtye, although you are educated, a graduate of a college, and speak fine English, that you cannot put up a defense like has been shown in this case, and deceive an American jury." The opinion of the court as to the impropriety of this remark coincided with that of appellant, and the judge said: "There is no evidence whatsoever that Mr. Ahtye ever manufactured any evidence in any manner whatsoever in this case. Therefore, disregard the remarks of the district attorney, so far as Mr. Ahtye manufacturing or made any defense in this case whatsoever. There is no evidence in this case to that effect at all." As to this, we must also assume that the jury followed the admonition of the court. Moreover, there was evidence of interest and activity on the part of Ahtye, and the district attorney, be-

lieving as he undoubtedly did, that the defendant was guilty of deliberate murder, and that his so-called self-defense was simulated, was probably justified in drawing the inference that Ahtye was responsible for the fraudulent claim that was made. But even if he was mistaken as to the proper inference to be drawn from the evidence, we must assume that the jurors were men of intelligence and probity, and not to be misled by the district attorney's erroneous impressions or faulty logic. It is probable that in the heat of argument some statements were made by the district attorney that might very properly have been left unsaid, but we are satisfied from the examination of the record that this officer had no desire to prejudice the rights of defendant or take an unfair advantage of him, and that, while zealous in the discharge of his duty as public prosecutor, he did not violate any of the constitutional rights of appellant. (See *People* v. *Yee Foo,* 4 Cal. App. 730, [89 Pac. 450].) Indeed, we are satisfied that appellant was accorded a fair and impartial trial, and was justly convicted of the offense charged against him.

We may refer to two or three rulings as to evidence made by the court, of which complaint is made by appellant. One Mah Guey was called as a witness for defendant and testified to a singular occurrence at the How Yuen Tong Club between 8 and 9 o'clock that evening immediately preceding the homicide. After testifying that the deceased came in and pointed his finger at Henry Lee and Ah Wing, while at the same time he was pulling a revolver from his pocket and was trying to shoot them, he further testified that he, through the assistance of other Chinamen present there, disarmed the deceased, that the latter demanded the gun back, that he would not give it to him, and that deceased used a vile epithet, said he would go and get another one and come back and kill "you buggers." "After that he left and when he left I told Ah Lee and Ah Wing to leave the place and avoid trouble." This latter statement as to what he told Ah Lee and Ah Wing was stricken out on motion, and we think correctly so, as it was clearly hearsay, and was no part of any threats or demonstrations made by deceased against said defendant. We may state in this connection that defendant, when on the stand, testified to this same declaration on the part of Mah Guey. There was no objection to it, and it was probably offered as

affording some explanation of his reason for leaving the place. At any rate, the jury got the full benefit of it for what it was worth.

Complaint is also made that the court permitted evidence of the flight of the codefendant Ah Wing. This was probably technically erroneous under the ruling of *People* v. *Stanley*, 47 Cal. 113, [17 Am. Rep. 401], and other cases following it. It appears that in the Stanley case the defendant and three persons jointly indicted with him were discovered by a policeman in the act of attempting to perpetrate a robbery, and immediately after the attempt they proceeded to a saloon, where they were all soon after arrested by the same and another policeman. After leaving the saloon and while being conducted to the jail, one of them (other than the defendant) broke away from the officers having him in charge, and attempted to escape by fleeing, but after considerable chase he was recaptured. The evidence of the attempt to escape was admitted against the objection of the defendant, and the supreme court, referring to the "flight," said: "At most it is but a circumstance tending to establish a consciousness of guilt in the person fleeing; and it would be extending the principle to a great length to hold that the flight of one person tends to establish the guilt of another person." In that case it is to be observed that there was no evidence of the flight of the defendant, but in the case at bar it is beyond question that the defendant himself as well as Ah Wing attempted to escape; the evidence all shows that appellant himself attempted it, he admitting it on the witness-stand; hence, it is perfectly apparent that the evidence as to Ah Wing's flight could not possibly have prejudiced the defendant.

Appellant also claims that photographs of the locality of the shooting were improperly admitted in evidence. The objection is based largely upon the fact that one of these contained sticks of wood laid in the street on the next day after the shooting to indicate where the witness, C. J. Bartholdt, had seen the two defendants and the deceased when he turned after the first shot, the wood not having been there at the time of the shooting. It seems that Bartholdt, before the trial, had pointed out this location, and the sticks of wood were placed there to aid his memory. We think there was no error in the ruling. It comes within the spirit of *People*

v. *Clapp,* 26 Cal. App. 523, [147 Pac. 469], and cases therein cited. Of course, the photograph was admitted for the purpose of illustration only and not as evidence of what in fact occurred. As to the photograph of the wounds, it may be that it should not have been admitted, since it appears that probes were inserted therein subsequent to the shooting, but in the absence of the exhibits it is apparent that we cannot determine that thereby any prejudicial error was committed. The purpose of the offer was to illustrate the place of entry of the bullets, in support of the contention of the people that deceased was shot from behind. We cannot presume that any such effect was produced. Besides from the testimony of appellant himself, as well as that of other witnesses, there could hardly be any question upon that subject.

It is claimed that the court coerced the jury into rendering a verdict against the appellant. It seems that after the jury retired, they were brought back into the courtroom two or three times. The first time was to obtain the exhibits that had been offered in evidence; the second time for additional instructions, and again they returned and the foreman said: "We have come to the conclusion it is impossible to come to an agreement after a deliberation for quite a while." Thereupon the court said: "Do you want any of the instructions read?" Thereupon the foreman said: "They have already been instructed. It is perfectly clear to me, it seems to be to the others. The instructions are perfectly plain to me. If any of the other jurors would like an instruction—" The court thereupon asked how the jury stood and the foreman said: "The last ballot stood eight to four, in—" Whereupon the court questioned each of the jurors as to his belief as to the probability of an agreement on a verdict, and each declared that it was impossible to agree. Thereupon the following took place:

"Gentlemen, the court is going to lock you up for the night, until 9:30 o'clock to-morrow. The court will keep you here until 9:30 to-morrow morning. At that time you will be returned into court.

"A Juror: Return at 9:30 o'clock?

"The Court: No, return to the jury-room. At 9:30 to-morrow morning the court will ask you to come in. By that time you will see whether you have reached a verdict or not."

At 9:30 the next morning the jury were called and the foreman stated that they still disagreed, and the court said: "The court is not satisfied, gentlemen, that you cannot agree on a verdict in this case. It realizes, gentlemen, it is your bounden duty to agree on a verdict, if you can conscientiously do so within the law and the evidence. The court is not satisfied that you cannot agree. It is the instructions of the court that you be returned to the jury-room for further deliberation and discussion of the case." One hour and a half thereafter the jury returned with the verdict. We cannot say that the court abused its discretion in refusing to discharge the jury, or that it did more than insist that they have ample time for consideration and reflection. The case was an important one; it had consumed many days in its trial, and the court was naturally and properly anxious to have it determined, if it could be done without any infraction of the rights of the defendant. We cannot see that any improper influence was exerted by the court, nor does it appear that the verdict was anything but the deliberate and voluntary act of all the jurors. This circumstance affords, we think, no just ground for criticism, much less a reason for reversing the judgment.

In reference to the instructions, we think the jury were correctly and sufficiently informed as to the law of the case. All those necessary, fundamental, and essential legal concepts relating to the situation were clearly presented, including the nature of the charge, the definition of the various offenses contained therein, the necessity of the prosecution proving beyond all reasonable doubt every material element of any crime contained within said information before the jury would be warranted in finding a verdict of guilty, the presumption of innocence attending the defendant at all stages of the case, the function of the jury to determine the credibility of the witnesses and the weight of the evidence, the definition of reasonable doubt and the burden of proof, the right of self-defense, including the doctrine of appearances, and the necessity for the exercise of great care on the part of the jury in reaching a verdict of guilty, and in fact everything which the situation seemed to demand. It is true that certain terms of caution and remonstrance, sometimes given by trial courts to juries, were omitted, but as far as they had any important bearing upon the case they were, no doubt,

supplied by arguments of counsel and the common sense of the jury. We deem it unnecessary to notice the specific criticisms of appellant further than to say that we do not regard the following instruction erroneous as claimed by appellant: "The question of the sufficiency of the appearances upon which the defendant may act under the plea of self-defense is one of fact for the jury to determine from all the evidence in the case. The acts which a defendant may do and justify under a plea of self-defense depend primarily upon his own conduct, and secondly upon the conduct of the deceased, but there is no fixed rule applicable to every case. In determining whether defendant acted as a reasonable person upon the appearances as they were presented to him, the test is what such defendant had reasonable cause to believe, and did believe, as a reasonable person at the time of the killing, and not what subsequent events may have proved the actual situation to have been. The jury should judge the actions of the defendant in the light of all the circumstances surrounding him at the time of the killing. In other words, as far as possible, the jury should put themselves in the place of such defendant, and then judge him by the standard of what an ordinarily reasonable person acting in good faith would have done if placed in such a situation. In determining the sufficiency of the appearances presented to a defendant at the time of the killing, the jury is not limited to such defendant's estimate of those appearances, unless his estimate of the situation, viewed in the light of all the circumstances surrounding him at the time, was that of a reasonable person." We are satisfied that said instruction did not withdraw or attempt to withdraw from the consideration of the jury the circumstance of any threat that may have been made by deceased against appellant, as claimed by the latter. The gist of the instruction was that the jury should consider the situation as a reasonable person, and place themselves, if possible, in the position of the appellant, in order to determine whether he was justified in killing deceased. In order to place themselves in the position of appellant they must, of course, have viewed the conduct of deceased in the light of any threat he may have made against said appellant. In fact, the instruction directs the jury virtually to acquit the defendant if he had reasonable cause to believe, and did believe, that the killing was necessary. This would necessarily include the con-

sideration of any previous hostile demonstration on the part of the deceased. Manifestly the fact that such a threat may have been made would not justify the defendant in killing the deceased, but would be only a circumstance to be considered in connection with the conduct of deceased at the time of the homicide, as showing the probability that defendant was at the time in danger of being killed or receiving great bodily injury, and therefore justified in what he did.

We deem it inadvisable to notice further and more specifically the able argument of counsel for appellant. They certainly have made a strong presentation of a weak case, and to their persuasive skill exercised during the trial no doubt their client is indebted for his life.

The judgment and order are affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 19, 1917.