[Crim. No. 1421. Third Appellate District.—June 26, 1935.]

THE PEOPLE, Respondent, v. BERTHA TALKINGTON, Appellant.

E. H. Zion and A. R. Schottky for Appellant.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

Stephen P. Galvin, as *Amicus Curiae* on Behalf of Respondent.

PLUMMER, J.—The appellant was tried and convicted upon an indictment found by the grand jury of the county of Merced, charging that the appellant did, on or about the fifteenth day of October, 1934, in the county of Merced, state of California, murder one Lamar Talkington. The verdict of the jury is in the following words: ''We, the jury in the above entitled cause, find the defendant, Bertha Talkington, guilty of murder in the first degree, and fix the penalty at imprisonment in the State Prison of the State of California, for life, with mercy and leniency.'' From the judgment of conviction and the order of the court denying her motion for a new trial, the defendant appeals.

The defendant and her husband, Lamar Talkington (also known as ''Bob Talkington''), had for some two years prior to October 15, 1934, been residents of the town of Watsonville. The evening preceding leading up to the shooting of Lamar Talkington the defendant and her husband had planned a trip to Modesto. They left Watsonville about 6 o'clock on the morning of the 15th of October, and drove from Watsonville to Gilroy, and from Gilroy through the Pacheco Pass to a station called ''Wagner Station''. This station is at the intersection of the highway extending from Pacheco Pass to Merced, with the highway running south from Newman and Gustine. They turned at Wagner station to the north, and shortly afterwards the shooting occurred.

It appears that Lamar Talkington was a man addicted to the excessive use of liquor, and carried liquor with him for use on the trip. From Watsonville to Gilroy, through what is known as ''Heckler Pass'', Mr. Talkington took a rear seat in the automobile. The car was an old ''Oldsmobile Coach'', having only two doors. The front seats were of a collapsible type, the backs of which could be pushed forward and down on the seats. It appears that Mr. Talkington desired to have his wife drive very fast, and complained about her driving. The defendant, up to the place of the shooting, had been driving the car all day. After driving about two miles from Wagner station, and according to the defendant's story, her husband having quarreled with her

and complained about her slow driving, the defendant stopped the car, got out, and told him to get in the driver's seat and do the driving himself; that she would not drive the car any faster; whereupon he arose from the back seat, took a position on one of the front seats, and after arguing with her, finally said he would kill her, and reached into the back of the car in the direction of the back seat, or the pocket for the gun which was kept, and had been placed in the rear of the car. In the scuffle that ensued for the possession of the gun, five shots were fired. One bullet went through the hat of the defendant; another bullet went through her left arm near the elbow on the inside of the arm; another bullet pierced the left ear-lobe of the deceased; one bullet struck him below the right eye; another hit him in the chest, traveled across his chest in a parallel direction, and landed under the arm. Two bullets were later found in the body of the deceased; one bullet was found in the upper part of the automobile. The gun was a 22-automatic, known as a ''Woodsman''. The defendant then drove the car to Gustine, arriving there about 8:30 P. M.; was taken to a doctor's office, her wounded arm was dressed, and Lamar Talkington was found to be dead.

The first story told by the appellant was that they had been held up and shot by bandits. The second story, and the one she told upon the witness stand, was along the lines of what we have here set forth.

The gun with which the shooting was done was purchased by the appellant a few days before the fifteenth day of October, 1934, being procured at a second-hand store in Santa Cruz. Upon purchasing the gun the defendant gave a fictitious name. The record shows other circumstances in the case indicating that the shooting was the result of a plan conceived and carried out by the appellant. Two letters written by the appellant, addressed to herself, and signed by the name of ''Bob'', in which the deceased purported to set forth his worthlessness, were found in the home of the appellant and the deceased some days after the shooting.

■ Upon this appeal the first contention made by the appellant that the evidence is not sufficient to sustain the verdict, appears to be wholly without merit. In addition to what we have said, it appears that after the shooting, the appellant first opened the suitcase in which they had placed a few of their belongings to be used upon their visit to Mo-

desto, and scattered them about the bottom of the automobile. After driving a short distance from the scene of the shooting the appellant stopped the car, and threw the gun which we have mentioned, under a culvert. The appellant told the bandit story to the arresting officer, and also upon the inquest. After the discovery of the gun, it appears that she changed her story and testified at the trial along the lines which we have set forth. Further comment upon the insufficiency of the evidence seems to us unnecessary.

Upon this appeal eleven different grounds of error are assigned for reversal, all of which have been considered, but only a few which we consider serious will be set forth in this opinion.

After the cause had been submitted to the jury for deliberation, and the jury had retired to consider their verdict, the exact hour of which does not appear in the record, the jury, at 11:10 P. M. returned to the courtroom, and the following occurrences took place: ''The Court: Mr. Foreman, have you agreed upon a verdict? Foreman Schockley: No, sir, we have not, and there don't seem to be any chance to agree so far. Court: There doesn't seem to be any chance to agree? Schockley: It don't look like it. Court: How are you divided numerically? Foreman Schockley: Nine to three. Court: A difference over the degree of crime, probably? Foreman Schockley: Yes. Court: Well, at 12:00 o'clock the rest of us will be wanting to retire, but we can stick around here until about that time. Of course this jury should agree. Of course. We have made provisions for the remainder of the night, but I will give you an opportunity to have a little while longer here. You will have to retire; just retire, ladies and gentlemen of the jury.''

At 11:25 P. M. the jury again returned into court, and the following took place: ''The Court: Mr. Foreman, did you have something to say? Foreman Schockley: Well, Mr. Navon don't understand what was meant by the degree of crime; he wanted to know what you meant by the degree of crime. Court: Well, I just asked you if you had all agreed, but what it meant is this, that if you had all agreed, have you all agreed on the guilt of the defendant? Foreman Schockley: No, sir. Court: Some of them are for not guilty? Foreman Schockley: Three of them for not guilty and nine

for guilty. Court: Well, ladies and gentlemen of the jury, I want to say this: I have tried a great many cases in this court, and now I have the right to say to you what I believe in reference to the evidence in this case, and comment upon it, and you heard the argument of the District Attorney. I believe I agree with him almost absolutely. Now, as far as the penalty that should be inflicted, I don't want to say anything, and I don't believe I will at this time. I cannot see how anyone can, after hearing this evidence, can raise a very strong argument, or make an argument in defense, that is, to the extent that there is no crime committed here. To me, it appears impossible that these gunshot wounds could have been inflicted as the defendant contends,—yes, that is one thing. As far as motive is concerned, there are several things that are brought up here, and charged as motives for the commission of the offense, and the testimony of the defendant, you know, her statements are very conflicting here, given in many respects in reference to letters and the procuring of the gun at that particular time, and the insurance on her own life in his behalf just a few days before. Now, all of those things lead very strongly that she deliberately committed this act. Much has been said about Talkington, her husband, as to what manner of a man he was; it could be considered, maybe, for but one thing from a legal standpoint, maybe; you could regard it as to his conduct and the type of man he was, as they allege here, for mitigation or extenuation, maybe, but we cannot, as good citizens, tolerate the idea that one, anyone, can take the law in his own hands and kill any human being, unless that person is absolutely outlawed by the Governor of the State. Now, ladies and gentlemen of the jury, it looks to me, and as I told you before, I have tried a great many cases, and this is as clear as any case tried in this courtroom. That is all I have to say at this time. Juror Watson: I think an agreement can be had. Court: Well, if it can be reached within the next two hours—well, as far as that is concerned you are not going to get away from here for some time; you need not worry about that at all; you need not talk about that if you don't agree; as far as talking to me about getting away, forget it; just retire.''

At 12:05 A. M. the jury again returned into court to make some inquiry about the disposition of automobiles which be-

longed to the jurors. At this time counsel for the appellant asked that the record show that they had taken exceptions to the comments of the court, whereupon the court addressed the jurors as follows: "The Court: I feel that the jury should be instructed, under our law as the sole judges of the facts in the case, and they are entitled to their individual opinions upon the evidence, yes, as against the comment of the judge. The court has already admonished the jury that they are the sole judges of the facts in this case; of course, I would not send you back to the jury room, as far as that is concerned, if that was not the law; I haven't any right to command you, but I have the right to comment upon the testimony. Of course, at our last election here that power was given to the judge, and I have expressed my reason for my comments here, but of course the jurors are the sole judges and arbiters, finally, as to their verdicts; the jury has already been so instructed. As I take it, it makes no difference during the trial, before rendering a verdict, the judge has a right to give views."

█ The first contention made by appellant is that the amendment to the Constitution known as section 19 of article VI, adopted at the general election on November 6, 1934, did not give the court authority to comment upon the testimony introduced in the case, in any instance where the offense was committed prior to the adoption of the amendment. The section of the Constitution referred to reads: "The court may instruct the jury regarding the law applicable to the facts of the case, and may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause. The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them, and of the credibility of witnesses."

As applied to an offense committed on the fifteenth day of October, 1934, it is urged that the amendment comes within the provisions of section 10 of article I of the Constitution of the United States, which prohibits the passing of an *ex post facto* law.

A somewhat similar question was presented to the court in the case of *People* v. *Edenburg*, 88 Cal. App. 558 [263 Pac. 857], in which the court held that an amendment to section 1078 of the Penal Code, changing the method of examining

prospective jurors was not an *ex post facto* law, in that it did not deprive the defendant of any substantial right. In that case the opinion contained a quotation from *Calder* v. *Bull*, 3 Dall. (U. S.) 386 [1 L. Ed. 648], setting forth four specifications constituting an *ex post facto* law applied to criminal cases to wit: "1. Every law that make an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action; 2. Every law that aggravates the crime, or makes it greater than it was when committed; 3. Every law that changes the punishment and inflicts a greater punishment than was annexed to the crime when committed; 4. Every law that alters the legal rules of evidence, and receives less or different testimony than the law requires at the time of the commission of the offense to convict the offender." A number of cases are cited supporting the propositions just quoted, from which it appears that unless some substantial right is taken away, the objection that a later act is *ex post facto* is untenable. There is nothing in the amendment to the Constitution which deprives the defendant in this case of any substantial right. The same testimony was required to convict as would have been required without the amendment; the punishment is not increased; the crime is not aggravated; the act committed by the appellant was punishable, if a crime, when committed, if punishable at all. The fact that the amendment to the Constitution accorded the privilege to the court to comment upon the testimony and credibility of any witness did not lessen the degree of evidence necessary to convict, and did not take from the jury their exclusive right to judge all questions of fact, and also to pass upon the credibility of witnesses, irrespective of the comments of the court.

In *People* v. *Mortimer*, 46 Cal. 114, it was held that a law giving the prosecution the right to open and close the argument was not *ex post facto,* or did not alter the situation of the accused to his disadvantage. It was further held that such an act was a mere matter of procedure.

In *People* v. *O'Bryan*, 165 Cal. 55 [130 Pac. 1042], by a divided court it was held that section 4½ of article VI of the Constitution, though applicable to offenses committed prior to its adoption, is not obnoxious as against the federal Constitution prohibiting the passing of an *ex post facto* law; that

it did not require any additional testimony to establish the guilt of the defendant, but merely altered a rule relative to the disposition of the case upon appeal after trial and conviction. The change effected by the Constitution authorizing comment by the trial court upon testimony simply reestablished the mode of trial deemed proper at common law. Under such circumstances it has been held that such change is not prohibited by the federal Constitution. (*Beazell* v. *Ohio*, 269 U. S. 167 [46 Sup. Ct. 68, 70 L. Ed. 216].)

The question we are now discussing was under consideration in the case of *Kolkman* v. *People*, 89 Colo. 8 [300 Pac. 575], and was considered at length by the Supreme Court of Colorado. It was there held by a majority of the court that the adoption of a rule authorizing comments upon testimony by the trial judge is not violative of the constitutional inhibition set forth in section 10 of article I of the federal Constitution.

■ Did the court commit error in its inquiry of the jury as to how they stood numerically, and in its remarks in relation thereto, and as to what the court said concerning their further reporting a disagreement? We repeat again what took place covering the inquiry of the court as to how the jury stood, and as to how they were voting on the guilt or innocence of the defendant: "The Court: Have you agreed upon a verdict? Foreman: No, sir, we have not, and there don't seem to be any chance to agree so far. The Court: There don't seem to be any chance to agree? Foreman: It don't look like it. The Court: How are you divided numerically? Foreman: Nine to three. The Court: A difference over the degree of the crime, probably? Foreman: Yes." The jury was thereupon sent back for further deliberation, and at 11:25 P. M. the jury returned and the record shows the following: "Mr. Foreman, did you have something to say? Foreman: Well, Mr. Navon here don't understand what was meant by the degree of crime; he wanted to know what you meant by the degree of crime. The Court: Well, I just asked you if you had all agreed, but what it meant is this: That if you had all agreed, have you all agreed on the guilt of the defendant? Foreman: No, sir. The Court: Some of them are for not guilty? Foreman: Three of them are for not guilty and nine for guilty." Thereupon, the court made the remarks which we have set forth herein, at

the conclusion of which juror Watson remarked: ''I think an agreement can be had. The Court: Well, if it can be reached within the next two hours, well, as far as that is concerned, you are not going to get away from here for some time, and you needn't worry about that at all; you needn't talk about that if you don't agree. As far as talking to me about getting away, forget it; just retire.''

While a number of cases might be cited to the effect that reversible error was not committed when the trial court simply asked as to the numerical division of a jury, the great weight of authority is to the effect, however, that reversible error is committed if the trial court, in addition to asking the numerical division of the jury, also asks as to how they have voted with reference to the guilt or innocence of the defendant. (*Brasfield* v. *United States*, 272 U. S. 448 [47 Sup. Ct. 135, 71 L. Ed. 345] ; *Burton* v. *United States*, 196 U. S. 283 [25 Sup. Ct. 243, 49 L. Ed. 482].)

In addition to the rule set forth in the foregoing cases from the Supreme Court of the United States, a number of federal cases to this same effect might be cited. In an extended note to the case of *Kesley* v. *United States*, reported in 47 Fed. (2d) 453 [85 A. L. R. 1418, beginning on page 1450], so many cases are collected that we can only call attention to the law as there laid down. First, it is held by a number of cases that if the inquiry is limited only as to the numerical division of the jury, while erroneous, is not reversible. The law is then declared to the effect that if the inquiry is coupled with the purpose to ascertain how the jury is divided as to the guilt or innocence of the defendant, the province of the jury has been invaded, and reversible error has been committed.

As said in the case of *Brasfield, supra,* speaking of the practice: ''It can rarely be resorted to without bringing to bear in some degree, serious, although not measureable, an improper influence upon the jury, from whose deliberations every consideration other than that of the evidence and the law as expounded in a proper charge, should be excluded. Such a practice, which is never useful and is generally harmful, is not to be sanctioned.'' And as again said in the case of *Burton, supra:* ''All that the judge said in regard to the propriety and duty of the jury to fairly and honestly endeavor to agree, could have been said without asking for the fact as to the proportion of their division, and we do not

think that the proper administration of the law requires such knowledge or permits such a question on the part of the presiding judge." In the same annotation are collected a large number of cases showing that the statements and instructions which have the effect of unduly hastening the rendition of a verdict should never be made or given. On page 1452 of the annotations referred to are collected a number of cases in which it is held that the action of the court in so hastening the rendition of a verdict is improper. None of the California cases cited by the respondent show that the trial court went to the extent of inquiring as to how the jury voted on the guilt or innocence of the defendant.

In *People* v. *Piscitella,* 90 Cal. App. 528 [266 Pac. 349], we find the following in the opinion: "After the jury retired for deliberation they reported that they were unable to agree, and, according to the bailiff, requested further instructions. When brought into court their foreman announced that they had been unable to agree and that they stood eleven to one for conviction. The latter portion of the statement was not made in response to any question asked by the court. The court thereupon instructed the jury, the material portion of its instructions being as follows: 'There was not any intimation whatever as to how you stood. I indicated to you that I did not think you had been out long enough. There is one instruction that I should perhaps have given you, but I looked into your faces and perhaps concluded that it was not necessary. And that was, that while it was your duty, the duty of each one of you, to have your individual opinion in a case upon reason, upon the law, don't be arbitrary. You cannot be arbitrary. Eleven cannot be arbitrary; one cannot be arbitrary. You should be tolerant. You should listen to the statement of the facts of the case as produced here on the witness-stand, and after a full consideration of all the facts and upon the reasoning of your fellow jurors, if any one of you should be convinced—it makes no difference whether for conviction or against conviction—if you should be convinced you are wrong, then it is your duty, upon your oaths, to change your vote and vote in accordance with your conviction in the case, honest conviction.''

It clearly appears from the above quotation that the court had not invaded the province of the jury or sought to invade the secrecy that should surround the deliberations of the

jury, ascertain from them how they stood in relation to the guilt or innocence of the defendant, and then endeavor to induce them to bring in a verdict of guilty.

In the case of *People* v. *Lee*, 34 Cal. App. 702 [168 Pac. 694], the jury was simply asked as to the numerical division. The jury reported that they stood eight to four. The court said: "The court is not satisfied, gentlemen, that you cannot agree on a verdict in this case. I realize, gentlemen, it is your bounden duty to agree on a verdict if you can conscientiously do so within the law and the evidence. The court is not satisfied that you cannot agree. It is the instruction of the court that you be returned to the jury-room for further deliberation and discussion of this case." No inquiry was made by the court as to how the jury stood on the question of the guilt or innocence of the defendant; no word said by the court informing the jury that they were not going to get away unless they agreed upon a verdict, and that they need not talk to the court again about getting away unless they agreed upon a verdict.

In *People* v. *Rhodes*, 17 Cal. App. 789 [121 Pac. 935], no inquiry was made by the court as to how the jurors stood in relation to the guilt or innocence of the defendant.

In *People* v. *Conboy*, 15 Cal. App. 97 [113 Pac. 703], the jury, after having deliberated for seven and one-half hours, came into court and requested further instructions. The court said: "Now, gentlemen, I think I have read to you about all the instructions you desire upon these points, and I suggest to you that there is no reason why twelve honest, intelligent, reasonable men should not reach a conclusion in this case, and I am surprised that you have not done so already. And I want to say to you that you should consider the evidence offered and admitted here, and the law as given to you by the court, and decide this case upon that, and not upon any personal observation or relation or experience of any kind which you have had. Now, go out and do your duty." Judgment reversed.

We find from the language of the court in the Conboy case a statement showing a further instruction to the jury, as follows: "In a subsequent part of the charge the learned judge did inform the jury that they were the sole judges of all questions of fact and of the credibility of the witnesses, and that the court had no right to trench upon their province

in this respect, but the error already noted in the previous part of the charge was not cured by this subsequent statement. The fact still remained impressed upon the minds of the jurors that there ought to be no disagreement, and that the testimony would justify but one verdict.''

In the case of *People* v. *Baker,* 94 Cal. App. 687 [271 Pac. 777], the record shows that no inquiry was made as to how the jury stood or how the jury was divided on the question of the guilt or innocence of the defendant. It was there held that it was within the province of the court to admonish the jury as to their duty to reach a verdict if they could conscientiously do so.

In *People* v. *D'A Philippo,* 220 Cal. 620 [32 Pac. (2d) 962], no inquiry was made by the trial court as to the division of the jury upon the question of the guilt or innocence of the defendant.

In the case of *People* v. *Miles,* 143 Cal. 636 [77 Pac. 666], there was no intimation in the charge as to the remarks of the court with reference to how the jury should decide the case, but they should give the testimony fair consideration, and that the protracted character and expense of the litigation necessitated on their part the duty of honestly and faithfully arriving at a verdict. This was held not to invade the province of the jury. Justice McFarland, concurring in the opinion, added that such expressions were hazardous, and it would be better for the court to say nothing on the subject.

In *State* v. *Clark,* 38 Nev. 304 [149 Pac. 185], the Supreme Court of Nevada held that it was error for the trial court to inquire as to the numerical division of the jury. The remarks of the court in that case that it looked as though it might be easy for the jury to arrive at a verdict, were held improper, and the judgment of conviction reversed.

In the case of *People* v. *Sheldon,* 156 N. Y. 268 [50 N. E. 840, 66 Am. St. Rep. 564, 41 A. L. R. 644], it was held that an obvious effort of the court to compel an agreement of the jury required a new trial. The Sheldon case, however, shows that the trial court went much further in its attempt to coerce the jury than is shown by the record in the instant case.

On the question of the hazard in urging the jury to reach an agreement, we may further cite 8 California Jurisprudence, page 394, section 423.

In 16 C. J., page 1091, the rule is thus stated: "It has been held that it is improper for the court to ask the jury as to how they stand numerically in regard to the verdict. But, on the other hand, it has been held that it is not error to make such an inquiry without inquiring whether the division is for or against the defendant."

In none of the cases called to our attention, or which we have been able to find, is the implication contained in the language of the court addressed to the jury in the instant case, approved. In response to the statement of juror Watson,—"I think an agreement can be had"—the language of the court,—"Well, if it can be reached within the next two hours—well, as far as that is concerned you are not going to get away from here for some time, and you need not worry about that at all, you need not talk about that if you don't agree, as far as talking to me about getting away, forget it, just retire"—the first eleven words of this statement indicated to the jury, conclusively, following the inquiry as to how it stood upon the question of guilt or innocence of the defendant, that the court expected the jury to bring in a verdict of guilty inside of two hours, and then the jury is informed that if they do not do so, they are not going to get away for some time, and further, that they need not think about that, or rather, that they need not worry about that, need not talk about it if they did not agree, and that they need not talk to the court about getting away if they did not agree. Such language, we hold, necessarily tended to coerce the jury, and induce the belief in the minds of the jurors that they were not going to get away unless they agreed upon a verdict of guilty, such as outlined by the court in its comments, before the jury would be discharged.

In "Bowers on Judicial Discretion of Trial Courts", the language found in paragraph 371 appeals to us as being pertinent to the question here being considered: "It is a well-settled canon of practice that a trial judge has no authority, either by threat, intimidation, undue urging, or inapt suggestions, to affect the fair, conscientious and impartial deliberations of the jury. The fact-finding body of the mixed tribunal should be as unhampered and unfettered in the performance of its proper function as is the judge in his. As the presiding officer of the forum, the administrator of the proceedings, the trial court may advise an unagreed jury of

the importance of their reaching a verdict if they can do so without surrendering their conscientious convictions, but he cannot go beyond this and say anything to the prejudice of either party.'' See, also, *Kesley* v. *United States, supra,* to the effect that there can be no coercion of a jury reporting its inability to agree in a criminal case, outside the force of reason and advice as to the facts, as by threatening to keep them together until they agree.

In the case of *State* v. *Place,* 20 S. D. 489 [107 N. W. 829, 11 Ann. Cas. 1129], the Supreme Court of South Dakota had before it some questions which we are here considering. After the jury in that case had been out for a few hours, it reported to the court, and the following occurred: The court thereupon asked, ''What seems to be the matter?'' To which the foreman replied, ''We are shy on evidence.'' The court thereupon replied that he could not help them out any on the evidence; that if it were matters of law he could give them further instructions; ''but'', he said, ''you will have to agree in this case, for I will keep you together until you do agree''. This occurred, it appears from the record, some time before noon. At about 1:30 P. M. of the same day the jury came in with a verdict finding the defendant guilty as charged. The comments of the court were held error, and a new trial was ordered. In holding the comments of the court erroneous the following language was used: ''In this enlightened age no one will contend that a verdict should stand which does not, at least presumptively, express the free and deliberate judgment of those who rendered it. The old rule permitting the coercion of juries has been swept away. Under modern methods of procedure the independence of the jury is, and it should be, respected. (*People* v. *Sheldon,* 156 N. Y. 268 [50 N. E. 840, 66 Am. St. Rep. 564, 41 L. R. A. 644].) 'No juror should be induced to agree to a verdict by a fear that a failure to so agree would be regarded by the public as reflecting upon either his intelligence or his integrity. Personal considerations should never be permitted to influence his conclusions, and the thought of them should never be presented to him as a motive for action.' (*State* v. *Bybee,* 17 Kan. 462.) Nor should the decision of a juror be influenced by a fear of indefinite confinement in a jury-room, to his own and his associates' inconvenience and discomfort. This, in effect, is conceded by the learned attorney-general; but he

insists (1) that coercion cannot be inferred from any fact disclosed by the record in this case, and (2) that, if any of the jurors were unduly influenced our rules of criminal procedure afford no means by which the error may be reviewed.''

In view of the authorities cited and what is disclosed by the record as hereinabove set forth and considered, we think it must necessarily be held that the court erred in its inquiry as to the status of the jury on the question of the guilt or innocence of the defendant, and also in the statement to the jury that they need not talk about getting away if they did not agree; and that such errors were prejudicial and tended to prevent the appellant from having a fair and impartial trial.

█ While we have held that under the provisions of section 19 of article VI of the Constitution as amended in 1934, the court in this case had a right to comment upon the evidence, the testimony and credibility of any witness, that section of the Constitution does not admit of an argument being made by the court to the jury under the appellation of ''comments''. The contention of the appellant that the comments of the court were not within the purview of the amended section, but simply constituted an additional argument, appears to us to be well taken. This conclusion results from an analysis of the comments. After addressing the jury the court said: ''I have tried a great many cases in this court, and now I have the right to state to you what I believe with reference to the evidence of this case, and comment upon it, and you heard the argument of the District Attorney. I believe I agree with him almost absolutely.'' There is nothing in the amended section of the Constitution authorizing the court to express its approval of the argument made by prosecuting officers. The address of the district attorney to the jury is too lengthy to be incorporated herein, but as an illustration of what was approved by the language of the court, we quote from the district attorney's argument the following: ''Now, ladies and gentlemen of the jury, I am getting tired, and probably I have tried you long enough, but I submit to you that the evidence in this case produced by the prosecution that the facts show, the physical facts, that this must have happened as outlined to you, and from the defendant's own testimony, her own story, the most of it proves to a moral

certainty, to a certainty as any fact was ever proven to you, and beyond a reasonable doubt, that Bob Talkington, or Lamar Talkington, was wilfully and deliberately, maliciously and with premeditation, killed and murdered, and that the murderess is the defendant, Bertha Talkington, and as the District Attorney of this County on behalf of the State of California, and the People of the State of California, I ask of you a verdict of guilty of murder in the first degree.''

We do not wish to criticize in any manner the impassioned appeal of the district attorney, or to intimate that he traveled outside of the legitimate range accorded him, in his remarks to the jury, but there is nothing in the amended section of the Constitution authorizing the court to make such an impassioned appeal, nor in approving such an appeal when made by the district attorney.

The appellant contends that the endorsement by the court of the argument of the district attorney constituted an approval of the language of the deputy district attorney wherein the jury was requested to find a verdict of murder in the first degree without recommendation upon its first ballot. To so hold, however, is unnecessary to a decision of this case. The court then continued: ''Now, as far as the penalty that should be inflicted, I do not want to say anything, and I don't believe I will at this time. I cannot see how anyone can after hearing this evidence, can raise a very strong argument, or make an argument in defense, that is, to the extent that there is no crime committed here.''

If the second account of the tragedy given by the appellant is true, that the deceased reached for the gun first, after making a threatening remark to the appellant, and that the deceased came to his death by the gun being discharged during a scuffle for its possession, a verdict of not guilty would have been proper. The defense had a right to address the jury on the assumption that the appellant's account was correct, and if a juror conscientiously believed the account given by the appellant, then he had a good basis upon which to build an argument. This language of the court is not a comment upon the evidence, but a comment upon an argument that either had been, or might be used. If the court desired to comment upon, and call to the attention of the jury testimony in the case which should be considered as controverting

the truthfulness of the appellant's account, and as indicating a premeditated purpose to terminate the life of the deceased, attention might very properly have been called to the testimony showing the purchase of the gun by the appellant just a few days previous to starting on the trip from Watsonville to Modesto; the giving of a fictitious name at the time of the purchase of the gun, and what was said by the appellant at the time as to the purpose for which it was being procured; likewise, attention might have been called to the two letters written by the appellant to herself, signed by the name of the deceased, purporting to have been written by the deceased, in which he set forth, among other things, his worthlessness; also, attention might have been called to a letter written by the appellant indicating her high regard for another man; and the fact that at least a $4,000 insurance policy on the life of the deceased was made out in favor of the appellant; in addition to appellant's first story as to bandits; and the attempted concealment of the gun under a culvert; the disarrangement of the contents of a suitcase; followed by the change in the account of the affair after the discovery of the concealed weapon. We quote further: "To me it appears impossible that these gunshot wounds could have been inflicted as the defendant contends. Yes, that is one thing." (And this language is simply a conclusion, and is not the exposition of any testimony.) "As far as motive is concerned, there are several things that are brought up here and charged as motives for the conmission of the offense, and the testimony of the defendant, you know, her statements are very conflicting here, given in many respects with reference to letters and the procuring of the gun at that particular time, and the insurance on her life in his behalf just a few days before." The insurance, of course, on the life of the appellant in favor of the deceased which was taken out a short time before the 15th of October, 1934, could have no bearing upon the criminality of the appellant.

The record shows an insurance on the life of the deceased in favor of the appellant, as we have said, and likewise, an insurance on the life of the appellant in favor of the deceased. So far as we have been able to discover, the only recent insurance policy is that relating to the life of the appellant in favor of the deceased. What we have last quoted of the court's comments does refer to letters without mentioning

their purport, and also to the procuring of the gun, and the insurance on appellant's life. It is probable that the court intended to refer to the insurance on the life of the deceased, but the fact that it was taken out long previous to October 15, 1934, might properly be considered.

The court then continued: "Now, all of those things lead very strongly that she deliberately committed this act. Much has been said about Talkington, her husband, as to what manner of man he was, it could be considered, maybe, for but one thing from a legal standpoint, maybe; you could regard it as to his conduct and the type of man he was, as they allege here, for mitigation or extenuation, maybe, but we cannot, as good citizens, tolerate the idea that one, any one, can take the law in his own hands and kill any human being, unless that person is absolutely outlawed by the Governor of the State." The appellant contends that this language conveyed to the jury the idea that no one had a legal right to take the life of another in necessary self-defense. If it does not mean that, we are somewhat at a loss to understand what thought was intended to be conveyed. The words, "unless that person is absolutely outlawed by the Governor of the State", has no place either in legal language or in the realm of jurisprudence. The court then concluded: "Now, ladies and gentlemen of the jury, it looks to me, as I have told you before, I have tried a great many cases, and this is as clear as any case tried in this courtroom." That is not a comment upon the testimony in the case, but a comparison of this case with previous trials over which the court had presided. We revert to the language used by the court relative to penalty, to wit: "Now, as far as the penalty that should be inflicted, I don't want to say anything, and I don't believe I will at this time." The use of these words, while not within the authority given the trial court by the amended section of the Constitution, we consider harmless.

Following the return of the jury, as we have stated, to make some inquiries regarding the care of their automobiles, and an exception taken by the appellant to the comments of the court, the court admonished the jury that they were entitled to their individual opinions, as against comments of the court, as we have hereinbefore set forth.

While a number of the federal cases cited show that the court may express an opinion as to the guilt or innocence of

the accused, the Supreme Court of the United States in an opinion handed down December 11, 1933, in the case entitled, *United States* v. *Murdock,* 290 U. S. 389 [54 Sup. Ct. 223, 78 L. Ed. 381], has ruled adversely to the right of the court to express such an opinion. In that case the trial court used the following language: "So far as the facts are concerned in this case, gentlemen of the jury, I want to instruct you that whatever the court may say as to the facts is only the court's view. You are at liberty to entirely disregard it. The court feels, from the evidence in this case, that the government has sustained the burden cast upon it by the law, and has proved that this defendant is guilty in manner and form as charged, beyond a reasonable doubt." Considering this language, the Supreme Court said: "In the circumstances we think the trial judge erred in stating the opinion that the respondent was guilty beyond a reasonable doubt. A federal judge may analyze the evidence, comment upon and express his views with regard to the testimony of the witnesses. He may advise the jury with respect to the facts, but the decision of the issues of fact must be fairly left to the jury." (Citing a number of cases.)

In *Quercia* v. *United States,* 289 U. S. 466 [53 Sup. Ct. 698, 77 L. Ed. 1321], the court said: "Although the power of the judge to express an opinion as to the guilt of the defendant exists, it should be exercised cautiously, and only in exceptional cases. Such an expression of opinion was held not to warrant a reversal where, upon the undisputed and admitted facts, the defendant's voluntary conduct amounted to the commission of the crime defined by the statute." We are taking this language from the opinion of the court in the Murdock case, *supra.* In the instant case the language of the district attorney which we have quoted, and which was approved by the court in its comments, goes far beyond the language of the trial court in the Murdock case, which was held by the Supreme Court of the United States to be error.

In the case of *O'Shaughnessy* v. *United States,* 17 Fed. (2d) 225, the court considering the fact that the comments of the court were only upon evidence tending to show the guilt of the accused, ruled as follows: "While it is permissible for a federal judge, presiding in the trial of a criminal case, to comment on the evidence and to express his conclusions as to the guilt or innocence of the accused, he is under

a duty to be impartial in doing so, not to make his comments in favor of, or against one side only, and, if he states the evidence, he should state it fairly and accurately, both that which is favorable to the accused, and that which is unfavorable. When there is evidence supporting a verdict of not guilty, argumentative statements, based on recitals of incriminating evidence only, are not warranted, and what is said as to evidence referred to should not be misleading as to the relevancy or probative value of such evidence. (*Starr* v. *United States,* 153 U. S. 614 [14 Sup. Ct. 919, 38 L. Ed. 841]; *Hickory* v. *United States,* 160 U. S. 408 [16 Sup. Ct. 327, 40 L. Ed. 474]; *Weare* v. *United States,* (C. C. A.) 1 Fed. (2d) 617.) We are of the opinion that exceptions to parts of the court's charge were well taken. The court's recital of the evidence with reference to O'Shaughnessy lacked impartiality, as only evidence of his guilt was referred to and stressed; that tending to prove his innocence not being stated or commented on. The part of the charge dealing specifically with the evidence as to Donoghue is subject to similar criticism. It was not set out, because it was similar to the part of the charge dealing with the evidence as to O'Shaughnessy.''

There is not a word in the comments of the court in the instant case relative to the testimony in favor of the appellant, and it necessarily lacked impartiality, just as held by the court in the O'Shaughnessy case, *supra.*

In the case of *Sunderland* v. *United States,* 19 Fed. (2d) 202, the following comments of the trial court were held argumentive, to wit: ''The evidence justifies the claim of the government. The government is justified apparently in claiming.'' The evidence further discloses: ''It is further shown to me clearly by the evidence, the evidence would further indicate to me, and I feel little dispute about it in the testimony.'' Here we have an expression of the court saying: ''I believe I agree with him almost absolutely.'' (Referring to the argument of the district attorney in this case.) There is no difference between an endorsement or approval or expression of an agreement with the argument and claims of a district attorney, and the words used in the Sunderland case. The evidence justifies the claim of the government, save and except that in the instant case the language of the trial court was not based upon the evidence.

In *Graham* v. *United States,* 12 Fed. (2d) 717 (we quote from the syllabus), the holding of the court was: "While a federal judge may properly sum up the evidence and may express his opinion as to its effect, it should be done in such a manner that everyone shall recognize that what is said from the bench is the actual and well-balanced utterance of an impartial judge, and has in it naught of the heat and partisanship of an advocate."

We do not deem it necessary to comment upon the uncertainty of ideas injected into the trial court's comments by the use of the word "maybe", further than to say it is likewise argumentative in form, and does not contain a clear and explicit statement of the law. That the remarks or comments of the court on the testimony must not be argumentative in form is shown by the long list of cases cited in the annotations beginning on page 793, following the case of *State of Michigan* v. *Wudarski,* as reported in 253 Mich. 83 [234 N. W. 157, 95 A. L. R. 782]. The citations to which we refer begin with that of *Starr* v. *United States,* 153 U. S. 614 [14 Sup. Ct. 919, 38 L. Ed. 841]. We quote from the annotations as follows: "There is a line of cases which, in a holding that the instructions and comments of the trial judge should not be argumentative in favor of the guilt of the defendant, assign as a reason for such holding, that inasmuch as the judge cannot direct a verdict of guilty in criminal cases, even where the facts are undisputed he should not be permitted to do indirectly what he cannot do directly, and by his instructions argue the jury into a verdict of guilty."

In the case of *Malaga* v. *United States,* 57 Fed. (2d) 822, 825, we find the following in the opinion: "We think a trial judge should hesitate in expressing his opinion on the guilt of a respondent in a criminal case, though he may be permitted to give his opinion on the evidentiary facts. Argumentative discussion on the effect of evidence as proof, or the inference to be drawn from the acts of witnesses or the respondent in a criminal case are universally recognized as out of place from the bench." It is further held in that case, and also in the case of O'Shaughnessy, *supra,* that: "General statements in the charge to the effect that the jury are at liberty to disregard the court's views as to the defendant's guilt or innocence, and to base their verdict on their own con-

clusions from the evidence, do not cure the fault in the charge of a lack of impartiality in submitting the evidence to the jury, or justify the court in making one-sided recitals of evidence, or in furnishing arguments in behalf of only one side of issues, as to which the evidence is conflicting.''

In the Graham case, *supra*, the court ruled as follows: ''Moreover, it is always the right of the federal judge to review and marshal the testimony, and it is often his duty, for in no other way can he more effectively promote the doing of justice. In any particular case, it may be that the evidence is such that to sum it up fairly and intelligently is to come close to a demonstration of the guilt of accused. That is no reason why the summing up should be omitted, or the conclusion to which it points evaded or obscured. In the discharge of this high function, it is, however, of the first importance, both to the particular defendant who may be on trial and to the administration of justice generally, that everyone shall recognize that what is said from the bench is the cool and well-balanced utterance of an impartial judge, and has in it naught of the heat and partisanship of the advocate.''

In *Hunter* v. *United States*, 62 Fed. (2d) 217, it is said: ''If the trial judge comments on the evidence, he should call attention to the evidence in favor, as well as that against the accused.''

In *Weare* v. *United States*, 1 Fed. (2d) 617, we find the following which has a direct bearing upon the comments of the court in the instant case, to wit: ''The jury can easily be misled by the court. Its members are sensitive to the opinion of the court, and it is not a fair jury trial when the court turns from legitimate instructions as to the law, to argue the facts in favor of the prosecution. The government provides an officer to argue the cause to the jury. That is not a part of the court's duty. He is not precluded, of course, from expressing his opinion on the facts, but he is precluded from giving a one-sided charge in the nature of an argument.''

In *Minner* v. *United States*, 57 Fed. (2d) 506, where the trial court undertook to sum up and comment on the evidence and narrate only the important facts testified to by the witnesses for the government, and wholly failed to sum up

the evidence in behalf of the defendant, his comments were held to be in the nature of an argument to the jury, rather than a fair and dispassionate statement of what the evidence showed. It was further held that: ''In doing so he assumed the role of an advocate, rather than that of an impartial judge.''

In the case of *Kesley* v. *United States, supra,* it was held that it was not error for the court to comment upon the testimony after the jury had reported a disagreement, provided it was done dispassionately and fairly. Other cases have held that the comments on the testimony should be made in connection with the charge to the jury as to the law involved in the action. No case has been called to our attention, however, holding that reversible error is committed when the comments are not made until after the jury has reported a disagreement.

In the case of *Kolkman* v. *People, supra,* it was held by a divided court that the following comments by the trial judge did not warrant a reversal, to wit: ''Gentlemen of the Jury: There are four defendants named in the information. All four of these defendants have testified in this trial. Only two of the defendants, viz: John Kolkman and Roy Kolkman are on trial. The two Morrisons who are named as defendants are not on trial here. There is a direct conflict between the evidence offered by the two Kolkmans, who are on trial and that given by the two Morrisons who are also defendants. The two Morrisons have testified for the state. The court believes that the evidence when taken as a whole, and all the circumstances as they have been presented here, show that all four of these defendants are equally involved in the crime charged in the information, and all four stand equally before the law in the same position. These comments that the court makes are not binding upon you. You are to make your finding and return your verdict as you may find the evidence warrants.'' The court did not purport to approve an argument made by the district attorney, but simply went to the effect that all of the parties were involved in the same transaction; and in the same comments, and as the concluding paragraph thereof, admonished the jury that what the court said was not binding upon them. In some particulars this case seems to be in conflict with the cases which we have

cited, and also with the Murdock case, *supra,* decided by the United States Supreme Court.

In the case of *Simmons* v. *United States,* 142 U. S. 148 [12 Sup. Ct. 171, 35 L. Ed. 968], the comments were made after the jury had reported a disagreement. The propriety of making comments after the jury had reported a disagreement was not, however, passed upon by the court in that case.

We conclude our review of the cases with the statement that the overwhelming weight of authority is to the effect that comments in an argumentative form constitute reversible error; that comments must be made in such a manner that the court does not assume the role of an advocate; that the comments must be temperately and fairly made; and if the testimony is reviewed, it must include the testimony offered in favor of, as well as against the accused.

The verdict of the jury in this case, after finding the appellant guilty of murder in the first degree and fixing the penalty at imprisonment for life, and concluding with the words, "with mercy and leniency", is inexplicable, except upon the theory that the comments of the court to the effect that he would not at that time say anything about the penalty, led the jury to believe that the court possessed power to comply with the words which we have quoted, or that after the comments of the court, the jurors who had voted not guilty agreed to a verdict of guilty after the quoted words were added to the verdict.

From what is said in the foregoing, we find no escape from the conclusion that the court erred in adopting the argumentative form in its comments to the jury, and that as held in some of the cases, the error having been committed, the subsequent admonition of the court did not remove the effects thereof.

The court did not err in permitting witnesses to testify who had remained in the courtroom contrary to the admonition given at the beginning of the trial not so to do. The state was entitled to their testimony, even though such witnesses may have rendered themselves subject to a charge of contempt.

We do not find any prejudicial error in the admission of a certain hat used as an exemplar in the case, or in the testimony of the witness who made experiments therewith.

Our somewhat lengthy discussion of this case has been rendered necessary for the reason that it is the first case arising under section 19 of article VI of the Constitution as it now stands amended.

We do not think that the provisions of section 4½ of article VI of the Constitution apply to the errors committed by the trial court in this case, but if such is the case, we hold, nevertheless, that the errors complained of were prejudicial.

The order and judgment of the trial court are reversed and the cause remanded for a new trial.

Thompson, J., and Pullen, P. J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 25, 1935.