July 26, 1893.

---

### Stocks *v.* The State.

When, during the trial of a capital case, the mother of a juror died, it was not improper for the court to inform the juror of the fact, and to discharge him from further service in the case; and after so doing, there was no error in declaring a mistrial, nor in overruling, at a subsequent trial, a plea of former jeopardy based on these facts. It is immaterial whether the accused did or did not consent to the juror's being informed of his mother's death, or to

the mistrial, the emergency authorizing the discharge of the juror, and thus ending the trial, being of a nature similar to one which would arise upon the serious sickness of a juror, or of the presiding judge, or sickness in the family of either requiring his personal care and attention, or from other cause which should be recognized as affording in law a sufficient necessity to warrant such action by the trial court. BLECKLEY, C. J., dissenting.
July 26, 1893.

Before Judge RICHARD H. CLARK. Fulton superior court. March term, 1893.

The plaintiff in error was indicted and tried for murder, and was convicted of voluntary manslaughter on June 10. He excepted to the sustaining of a demurrer to his plea of former jeopardy. From this plea appear the following facts: A trial of the case was begun on May 31; and during the examination of the fifth witness for the State, the judge, on being informed that the mother of one of the jurors had just died, directed the jury to retire; and, apprehending the possibility of a mistake as to who the deceased lady was, stated to counsel the information received, and inquired whether they were willing for the juror named to be called out and asked if he were the man. Defendant's counsel consented to this, but made no further consent. The juror was called and asked if his mother was sick, and answered that she had been sick but was not seriously ill when he left home. He was sent back to the jury-room, and shortly afterwards, the death of his mother having been definitely ascertained, he was discharged from further service. The judge then asked if counsel would consent to go on with the eleven remaining jurors. Defendant's counsel declined so to consent; whereupon the court discharged the eleven jurors, and declared a mistrial.

ARNOLD & ARNOLD and GLENN & SLATON, for plaintiff in error.

C. D. HILL, solicitor-general, and W. C. GLENN, *contra.*

Simmons, Justice.

It was a principle of the common law, announced by Blackstone to be "a universal maxim," that "no man is to be brought into jeopardy of his life more than once for the same offence." 4 Black. Comm. 335. This principle was embodied in the constitution of the United States by the fifth amendment, and similar provisions exist in nearly if not all the States of the Union. In view of this principle it became important in the early days of English jurisprudence to know when an accused person had in a legal sense been put in jeopardy. Some of the courts in England held that after a jury had been impanelled and sworn and charged with the case, they must return a verdict, and if for any reason they did not do so, the accused could not be again put on trial. Coke, in 1 Institute, 227b, says that "a jury sworn and charged in a case of life and member cannot be discharged by the court . . but they ought to give a verdict"; and in 3 Institute, 110: "If any person be indicted for treason or of any felony or larceny, and thereupon a jury is returned and sworn, their verdict must be heard and they cannot be discharged." The rule admitted of no exceptions, not even in case of the sickness or death of the prisoner or of a juror. Accordingly we read of juries being carried from county to county in carts, in order that they might return a verdict before being discharged. The rule was so arbitrary and the proceedings attendant upon it were so inconvenient and inhuman that exceptions were in the course of time established. So we read in the leading case of The King v. Scalbert, 2 Leach, C. C. 620, that during the trial of the prisoner for murder, one of the jurors was seized with a fit and carried from the court in an insensible state. A juror who examined him reported under oath that he thought he would not be able to attend the trial immediately. The jury were thereupon discharged and

another jury sworn, consisting of the former eleven and an additional one, and the prisoner was convicted. This case was followed and approved by all the judges eighteen years afterwards, in Rex *v.* Edwards, 3 Campbell, and the exception thus established is now recognized by all the courts, both in England and in this country. See 1 Leading Criminal Cases, Bennett's notes, 466. An exception to the rule was also made where the prisoner became ill during the trial. See the case of Elizabeth Meadows, Foster's Crown Law, 76, which is the earliest case holding that a jury could be discharged on this account; and see King *v.* Stevenson, 2 Leach, C. C. 546. To these exceptions were added others of a different character. Failure of the jury to agree upon a verdict before the expiration of the term of the court, was eventually recognized as a sufficient ground for thus discharging the jury without the consent of the prisoner and without prejudice to the further prosecution of the case. The contrary was held in two early cases in this country (Spier's case, 1 Devereux, 491, and The State *v.* Garrigues, 1 Heywood, 241); but these cases were not followed, and it is now universally conceded that such an occurrence presents a case of legal necessity. Then came the exception which allowed the discharge of the jury before the end of the term, without the prisoner's consent, when it appeared to the court that they were unable to agree upon a verdict. On this point there was great conflict among the courts in this country, a number of very respectable courts holding that nothing short of the illness of the prisoner or of one of the jury, or like physical necessity, would authorize the discharge of the jury without the consent of the prisoner; but the better opinion now seems to prevail, that the court has the power to discharge them after they have been out a sufficient length of time and it appears that they are unable to agree. Another exception was that made in

the case of Nugent *v.* The State, 4 Stewart & Porter's
Rep. 72 (Ala. 1833), where it was held that the sickness
of the presiding judge was a sufficient ground for dis-
charging the jury. This exception, so far as I have
been able to ascertain, is now universally recognized by
courts and text-writers. In the case of The State *v.*
Wiseman, 89 N. C. 203, it appeared on the trial of the
defendant for murder that one of the jurors had fraudu-
lently procured himself to be put on the jury for the
purpose of acquitting the accused. The judge withdrew
the juror and declared a mistrial. The Supreme Court,
on appeal, held that this was proper and that the de-
fendant could be again placed on trial, and that this was
so whether he was cognizant of the fraud or not. The
discharge of the jury under these circumstances was
placed on the ground of " legal necessity," or what was
denominated " the necessity of doing justice." In the
case of Simons *v.* United States, 142 U. S. 148, it was
held that " when it is made to appear to the court dur-
ing the trial of a criminal case, that, either by reason of
facts existing when the jurors were sworn but not then
disclosed or known to the court, or by reason of outside
influences brought to bear on the jury pending the trial,
the jurors or any of them are subject to such bias or
prejudice as not to stand impartial between the govern-
ment and the accused, the jury may be discharged and
the defendant put on trial by another jury ; and the de-
fendant is not thereby twice put in jeopardy, within the
meaning of the fifth amendment to the constitution of
the United States."

The foregoing instances are given more for the pur-
pose of showing that the courts are not limited to
exceptions already made, than because of any direct
bearing those mentioned may have upon the case now
in hand. All of these exceptions were founded upon
the doctrine of necessity ; but in deciding as to what

constitutes a necessity, the courts, as we have seen, have not been governed by an inflexible standard and have not felt bound to confine themselves to physical or absolute necessity, but have extended the doctrine as the ends of justice seemed to require. The tendency, as was said by this court in the case of *Nolan* v. *The State*, 55 *Ga.* 524, " has been to lower the standard so as to comprehend moral as well as physical necessity, and in the region of the moral, to be content with very moderate tests." That which unfits a juror for the performance of his duty creates a legal necessity; and such unfitness may result from mental suffering no less than from physical pain. As civilization and refinement have progressed, there has been a growing disposition on the part of the courts to recognize the influence of the feelings and emotions upon the mind as producing this necessity. In the case of The Commonwealth v. Fells, 9 Leigh (Va.), 613, the court regarded the condition of a juror's wife, who was about to give birth to a child, as presenting a strong case of necessity. In the case of The State v. Tatman, 59 Iowa, 471, while the defendant was on trial for a felony, the presiding judge received a telegram from his home to the effect that his wife was sick, and he thereupon adjourned the court until the following Friday, on which day he ordered a final adjournment. On the following Monday his wife died. At a subsequent term the defendant was again put on trial on the same indictment, and pleaded former jeopardy. The plea was overruled, and the Supreme Court affirmed the ruling. In Hawes v. State, 88 Ala. 60, it was held that the illness of a juror's wife presented such a necessity as authorized his discharge. See also Parsons v. State, 22 Ala. 53. A case which closely resembles the one we are now considering is that of The State v. Davis, 31 W. Va. 390 (1888), where information was imparted to one of the jurors, after the greater

part of the evidence had been heard in a felony case, that his son had just died. It was held that a necessity existed for the discharge of the juror, and that he was properly discharged, and that the court could substitute another juror in his place and proceed with the trial *de. novo.*

We think the action of the court below in this case is sustainable upon sound principle as well as upon authority. One whose mind is disturbed and distracted by sudden grief is certainly in no condition to discharge the grave and responsible duty of trying another for his life. What judge would be in a fit condition to preside on the trial of a capital case upon being summoned to the death-bed of his wife, his child or his mother? And would any court hold that a judge who is informed while trying a case that his wife has just died, cannot return to his home and attend her funeral, but must go on with the trial? No man of ordinary sensibilities, it seems to me, would be in a proper state of mind to discharge his functions as a judge on the trial of a case under such circumstances, and he should not be compelled to do so. As was said in the case of The State *v.* Tatman, *supra,* "the law makes no such inhuman requirements." If what has been said is true as to a judge, it is equally true as to a juror. In order to perform his duty properly, he must give his close and undivided attention to the testimony as delivered by each witness, and to the law as given in charge by the court; he must carry both in his mind and carefully apply the one to the other; and it is often necessary that he should make nice distinctions in the application of the law. It is not to be expected that a juror will perform this duty properly under the circumstances shown by the record in this case. The question to be considered is, not whether the juror, in view of the greater importance of trying the prisoner than of paying the last tribute of

affection and respect to his departed mother, should put aside his grief and proceed undisturbed in the performance of his duty, but whether as a matter of fact he is capable of doing this. If not, the ends of justice require that he be discharged from the jury. What was said by the court in the case of The State *v.* Davis, *supra,* where the juror was discharged on account of the death of his son, will apply equally in the present case : " Observation teaches us, if indeed we have not learned from sad experience, that the natural result of information suddenly imparted to a father, of the death of a child, is to unfit him for the time to attend to business. It would have been cruel to have required the juror to remain on the jury under such circumstances. His grief would naturally unfit him for the discharge of such an important duty. And if, as the court said in Fell's case, the object of the trial is to obtain a fair, just and impartial verdict, there is little prospect of it under such circumstances. This is one of the cases spoken of in the opinion in that case, where a juror is, from the peculiar condition of his mind and feelings, manifestly disqualified from bestowing on the case that attention and impartial consideration which is necessary to a just verdict."

But it is said in the present case that the judge should not have informed the juror of his mother's death, and that whether this was proper or not, it was unnecessary to have discharged the jury, as the trial could have been suspended and the juror sent in charge of a bailiff to attend the funeral. In reply to the first of these suggestions, I will say for myself that it would have been cruel and inhuman to have kept the juror confined without the knowledge of his mother's death; and to have required him to remain in the charge of a bailiff while attending her funeral rites would have been equally so, when according to the oath of the bailiff he could not

speak to the juror himself or allow others to do so.  To attend the funeral of a parent is regarded by the civilized world as a high and sacred duty, and funerals are often postponed to the last possible moment in order that some son or daughter from a distant place may attend.  What would be thought at this day of a judge who would inform a juror that his wife or mother had just died, but that, in consequence of the duty imposed upon him to try a man for a criminal offence, he could not be excused, and must put aside his grief and give his whole attention to the discharge of his duties?  We are satisfied that under the facts of this case the presiding judge had the power and authority to discharge the juror and declare a mistrial, and that the plea of former jeopardy was properly overruled.

Our constitution provides that "no person shall be put in jeopardy of life or liberty more than once for the same offence, save on his or her own motion for a new trial after conviction, or in a case of mistrial."  So it will be seen that the question which has so long agitated the courts in different States, as to the right of the judge to declare a mistrial, has been settled in this State by our organic law.  The granting of a mistrial is the act of the judge; he alone can grant it, and he alone, in the exercise of a sound discretion, determine what facts would be sufficient to authorize him to grant it.  Where the jury fail to agree, he is to determine from the length of time they have had the case under consideration, and by conferring with them, whether they will be able to agree or not.  In declaring a mistrial he must, as stated above, exercise a sound legal discretion.  He cannot do it capriciously.  If the facts which he finds and announces in his judgment show a legal necessity for a mistrial, a reviewing court will affirm his judgment; if no such necessity is shown, his judgment will be reversed.  We have attempted to show in the first division of this opin-

ion that the facts upon which the judge below in the case
at bar acted authorized him to declare a mistrial, and that
he did not abuse his discretion.     *Judgment affirmed.*

BLECKLEY, Chief Justice, dissenting.

1. One of the main reasons, not only for all rules of
trial, but for trial itself, is protection of the innocent.
The law presumes every man innocent until the contrary
legally appears.   When an innocent man is on trial for
a capital felony, his life is in peril.   The duty of pre-
serving an innocent life is higher, both morally and le-
gally, than that of attending any funeral whatsoever.   It
follows that when the mother of a juror dies pending
the trial of a capital case, the true necessity which arises
is absence from the funeral, not absence from the trial.
The juror being set apart and dedicated to the work of
delivering the accused from deadly peril, is to be regarded
as if in a far country or confined in chains which cannot
be broken.   His public trust denies indulgence to his
private sorrow.   His sacred duty to the dead is cancelled
by the more sacred duty which he owes to the living.

2. Consent for a juror to be informed of the death of
his mother, involves consent to accept such service as he
can render after the information has been communicated
to him, but does not involve any consent that the jury
may be discharged and a mistrial declared.   The plea of
former jeopardy should have been sustained.