[Crim. No. 426. Third Appellate District.—May 1, 1918.]

## THE PEOPLE, Respondent, v. KATE FROST, Appellant.

CRIMINAL LAW—MURDER—INTEMPERATE REMARK OF DISTRICT ATTOR-
NEY—INSUFFICIENT GROUND FOR REVERSAL.—In a prosecution for
murder, the statement of the district attorney in his closing address
to the jury that the defendant, if turned loose, would go back
and mix a little more booze with her Indian blood, and kill
another man, while somewhat intemperate, is not a sufficient ground
for reversal.

ID.—COMMUNICATION TO JUROR AFTER RETIREMENT—LACK OF PREJU-
DICE.—In such a prosecution, the act of the sheriff, after the jury
retired, in transmitting a communication to one of the jurors from
his wife to the effect that anthrax had appeared among the juror's
cattle cannot be held to have influenced such juror to consent to
a verdict by reason of the urgent necessity for his presence at
home.

APPEAL from a judgment of the Superior Court of Yolo
County, and from an order denying a new trial. W. A.
Anderson, Judge.

The facts are stated in the opinion of the court.

Shelley & Johnston, and John A. McGilvray, for Appel-
lant.

U. S. Webb, Attorney-General, and J. Charles Jones, Dep-
uty Attorney-General, for Respondent.

BURNETT, J.—Defendant was convicted of murder in
the second degree and she appeals from the judgment and
order denying her motion for a new trial. It is admitted that
she killed the deceased with a butcher-knife, but it was and
is the contention of defendant that his death was the result of
an accident. Her account of it is as follows:

"Well, I was fixing potatoes for supper, boiled potatoes,
and I was cutting the ends of them off so salt would go
through them when you cooked them, and as I was standing
there it was kind of dark and it was—the shade from the
levee—the levee is so high you can't see when the moon does
shine. I was standing with my elbows on the scow this way;
I heard some queer noise; I could not say what it was. I

whirled around that way in the dark; I whirled so quickly he fell right over on me, and I had the knife in my hand and my arm something like that—see?—and he came right down on me and caught himself with his hand, and I says, 'Oh, my God!' and he pulled himself back and says, 'Oh, Kate, I'm hurt!' ''

But the jury was justified in utterly rejecting her explanation of the gruesome affair. Indeed, one cannot read the entire record carefully and dispassionately without having an abiding conviction that her infliction of the wound was the result of a deliberately formed intention to take the life of the deceased, and that her contention as to it being an accident was an afterthought, a simulated defense, improbable, not worthy of credence, and justly repudiated by the jury.

We shall not set out the evidence at length. It is sufficient to say that it was shown that she had made threats to kill the deceased; that they were heard talking in a loud tone of voice for some time before the killing; that her conduct after the discovery by others of the crime was that of a guilty person; that she did not immediately declare that it was an accident; on the contrary, expressed a willingness to suffer the extreme penalty of the law, and, when it did finally occur to her to claim that the killing was accidental, her repeated story varied in important particulars and was stamped as inherently improbable by the following testimony of the physician who performed the autopsy: ''There was only one wound on the body except the wounds that had been made by the undertaker in preparing it. The wound was just above the left clavicle or left collar-bone. It was an incised and penetrating wound on the surface, about an inch and a half in the long diameter. The wound following down was almost directly downward and slightly inward, going in just back of the collar-bone. During the course of the instrument that made the wound the superficial structures were severed, the nerves going to the left arm, the roots of the nerves were cut. The left subclavian artery and vein were cut, the artery not quite in two; and then coming further down the apex or top of the left lung—there was a cut in that about an inch long. . . . The wound was almost parallel to the lung diameter—very slightly inward.''

The doctor further testified that it would be impossible for such a wound to be inflicted by one falling on a knife unless

the injured person "was bent absolutely over so his body was in a horizontal position; not if he was standing."

Indeed, it is plain that the wound could not have been and was not inflicted as claimed by appellant. The only rational conclusion is that she plunged the knife intentionally into the body, and this is the basis upon which we must consider the alleged errors to which our attention is directed.

1. In examination of one of the jurors upon his *voir dire* the district attorney made the following hypothetical statement of the burden of proof: "You understand, do you not, Mr. Armstrong, that if the prosecution has established the fact that the defendant killed the deceased and unless the prosecution also shows in their proof facts which would excuse the defendant from the crime of murder or some other fact which would excuse the defendant from the crime of murder, or some other fact which would discharge her of any crime, malice is presumed and the burden of proof is upon the defendant to show by a preponderance of the evidence that she was justified in what she did?" This seems to have been approved at the time by the trial judge.

The foregoing is not in the exact language of section 1105 of the Penal Code, to which section it was plainly designed to conform, but conceding a measure of inaccuracy to the statement, it is clear that it was without prejudice in view of the evidence in the case. Appellant in support of her claim that it embodied a wrong interpretation of the law quotes the following from *Perkins* v. *State,* 124 Ga. 6, [52 S. E. 17] : "Murder does not consist merely in killing a human being. The killing must be done with malice. When the fact of the killing is shown and the evidence adduced to establish the killing shows neither circumstances of justification or alleviation, malice may be inferred. Likewise if the statement of the defendant admits the homicide without explanation malice may be inferred from such admission. But if, at the time of the admission, the homicide is justified, such qualification of the admission robs it of the vital element of murder."

Herein, however, there was evidence of murder without the admission of defendant. Besides, the jury had the right to believe that at first she made no explanation nor attempt at justification, and it may be added that her asserted theory of accident is so inherently improbable as to be worthy of no consideration.

Apart from the foregoing, we may say—the jury were fully and correctly instructed at the close of the trial and directed to follow only those instructions. Hence it is apparent that if any such error as claimed was committed, it was cured by the subsequent action of the court.

2. At most, it could be said that the district attorney was somewhat intemperate in the following statement contained in his closing address to the jury: "You know what she will do, gentlemen of the jury. They ask you to excuse her. Why? Because he was full of booze and because she had Indian blood in her, and probably a little booze aboard too and she was full of fight. Now, gentlemen of the jury, is that any excuse—is that any reason why you should turn her loose and let her go back and mix a little more booze with that Indian blood and kill a man? That is exactly what will happen if you turn her loose; she will go back and kill another man."

We must assume that the district attorney was acting in good faith; that his remarks were in response to the argument of appellant's counsel, and we cannot say that the inference that she would commit another murder was unjustifiable, as a person capable of committing one murder might be liable to commit another. We need not refer to the cases on this subject. Much more objectionable statements on the part of the prosecuting officers have been held to be insufficient to warrant a reversal of a conviction of murder.

3. After the jury retired, the sheriff, in violation of section 1128 of the Penal Code, transmitted a communication to one of the jurors from his wife. This was heard by all the jurors, and was to the effect that anthrax had appeared among the juror's cattle on his ranch at Madison, and it included also the juror's direction in reply for the sheriff to have Dr. Alexander go out to the ranch as soon as possible. The sheriff communicated with Dr. Alexander, and the latter said he would go out in the morning. This was reported to said juror and he said that would be all right. The argument is that the juror was thereby induced to agree to a verdict by reason of the urgent necessity for his presence at home. It is thought, also, that the circumstance may have unduly influenced other jurors. The point is emphasized by reason of the fact that a short time before the jury had requested a statement from the court of the penalty for manslaughter, thus

evincing a consideration of the possibility of finding such verdict.

It is unfortunate that such incident occurred, and the sheriff should have consulted with the judge of the court before communicating with the jury, but we think it would be an unwarranted aspersion on the character of any of the jurors to hold that he would permit a circumstance like that to influence him to consent to a verdict against the defendant.

Is it not more likely that the jurors were thereby influenced to reach a more favorable conclusion than otherwise? They certainly would have been warranted in finding a verdict of murder in the first degree, but they agreed upon the lesser offense. At any rate, under the rule as now recognized, we cannot presume that the irregularity resulted in prejudice to the defendant. (*People* v. *Disperati,* 11 Cal. App. 469, [105 Pac. 617] ; *People* v. *Cord,* 157 Cal. 562, [108 Pac. 511].)

Some cases are cited by appellant wherein somewhat similar situations were held to involve error and to raise a presumption of injury, but now from the nature of the error itself or from other circumstances, it must appear affirmatively that harm was done to the defendant. It would have been safer practice for the district attorney to show that the jurors were not improperly influenced. Notwithstanding, we do not think the case should be reversed for a failure to do so.

The case of *Stocks* v. *State,* 91 Ga. 831, [18 S. E. 847]—as well as some others—cited by appellant, involved more serious and distressing news than herein, relating as it did to serious illness in the family of one of the jurors. Of course, it is important that all of the safeguards for the protection of the jury from extraneous influences be scrupulously maintained, and we do not approve of the course pursued in this matter, but we do think it should not be accorded the significance for which appellant contends.

4. In her criticism of the instructions of the court appellant claims that "No. 8" involves error for the reason that "it took from the jury the question of accidental killing."

Appellant is mistaken. It simply stated the presumption that a person "is supposed to mean to do that which he actually, intentionally, and willfully does in fact do." Of course, it would be a contradiction in terms to say that a person *accidentally* does what he *intentionally* and *willfully* does.

The instruction was probably unnecessary as involving a self-evident proposition, but it was not erroneous.

The same objection is made to instructions No. 9 and No. 13, and is equally without merit. These were all hypothetical instructions entirely inconsistent with the theory of accidental killing, but they left it to the jury to determine whether the facts, upon which they were based, were shown by the evidence.

Indeed, we may say that the jury were fully instructed as to every phase of the law—every instruction requested by the defendant having been given, and there seems to be no ground for criticism as to the action of the court in that respect.

The sum of the whole matter is that the record clearly reveals the guilt of the defendant, and she was fortunate in securing the verdict that was rendered, and any errors that may have been committed should be disregarded as without prejudice, if such are to be overlooked in any criminal case. (*People* v. *Lee*, 34 Cal. App. 702, [168 Pac. 694].)

The judgment and order are affirmed.

Chipman, P. J., and Hart, J., concurred.