[Crim. No. 1972. Third Dist. Nov. 30, 1946.]

THE PEOPLE, Respondent, v. LEO MACIAS, Appellant.

Stephen P. Galvin, Sr., and Stephen P. Galvin, Jr., for Appellant.

Robert W. Kenny, Attorney General, James O. Reavis, Deputy Attorney General, and Claude H. Adams, District Attorney, for Respondent.

ADAMS, P. J.—In an information filed in Merced County, defendant Leo Macias was charged with a violation of section 245 of the Penal Code, it being alleged that said defendant, on October 30, 1945, committed an assault upon the person of J. R. Jackman, while armed with a deadly weapon, "to wit: a wooden club." A demurrer to the information, interposed by defendant, was overruled, and after trial by a jury he was convicted. A motion for a new trial, based on all of the statutory grounds, was denied, and defendant has appealed from both the judgment and the order denying a new trial.

Asserted grounds for reversal are that the trial court erred in overruling defendant's demurrer to the information, that it misdirected the jury in numerous respects, that the district attorney was guilty of prejudicial misconduct, and that the verdict is contrary to the evidence and the law.

The evidence establishes that defendant Macias was, on the date of the alleged offense, the proprietor of a saloon and hotel in Merced. About seven o'clock in the evening of October 30, 1945, J. R. Jackman and George Baker, who were

working at the Merced Army Air Base, entered defendant's place of business—known as the Highway Hotel—where, as defendant said, he was entertaining "some of the boys who were going back to Mexico." Jackman was introduced to defendant by one Gomez, a Mexican laborer who also worked at the air base. Macias requested Jackman and Baker to bring Jerkovich, the foreman at the air base, to the Highway Hotel, saying he had some laborers available for work at the air base, whereupon Jackman and Baker left and returned about eight o'clock with Jerkovich and two other fellow workmen. According to the testimony of Jackman, some time after 10:30 Baker, who was drinking at the bar, knocked a bottle to the floor, and when he stooped to pick it up fell off a stool. Macias then remarked, "Another drunk," whereupon he and two other fellows threw Baker out. Jackman then walked to a table where Jerkovich was sitting and said that if Baker was not welcome he had rather go home. Thereupon Macias said "Another drunk"; that he did not like the "white sons-of-bitches" anyway, and to throw Jackman out. Jackman was then ejected by defendant and another, Macias saying, "We will finish them off." Outside a fight started between Baker, Jackman and a Mexican named Ayala. Macias emerged from the hotel and hit Jackman over the head with a wooden club, breaking the club and inflicting a wound which was described by a medical witness as a laceration on the top of the head that was about four inches long and quite deep, and looked as if it had been made by a blow, but not with a sharp instrument. After he was struck Jackman fled, whereupon defendant picked up one end of the broken club and ran after Jackman, following him several hundred feet to a point where Jackman sought refuge under a car in a parking lot. According to the testimony of the bartender, who was called as a witness for the defense, Macias did not go out when Jackman was ejected, but remained inside, the doors having been locked; but the witness saw fighting going on outside and called Macias' attention to it whereupon Macias telephoned to the police then grabbed the club, which was behind the bar, and went outside. According to Jackman, as he was being pursued by Macias the latter struck at him several times and said, "I will kill the son-of-a-bitch"; and while he was attempting to avoid attack by crawling under a parked car two police officers arrived, one of whom took charge of Macias and took the club away from him. One of these officers testi-

fied that he was assigned to investigate a row at the Highway Hotel, and as he approached the place saw Jackman being chased down the street by Macias who had a club in his hands; that he took the club away from Macias who said, "I will kill the son-of-a-bitch." He stated that blood was running down Jackman's face from a wound on his head and his shirt was bloody; that Jackman accused defendant of striking him and Macias admitted it; that they then went to the Highway Hotel with Macias and Jackman, where they found two or three persons standing around and Baker who was prostrate. The other officer stated that he saw defendant with a club in his hands pursuing Jackman, and about three feet behind him; that Jackman ran around a parked car with defendant after him, and crawled under the bumper; that Jackman was "bleeding terribly," that he was "a bloody mess" and that there was wet blood on the club; that after putting Macias and Jackman in the patrol car they went to the Highway Hotel where they found Baker— who was an Indian boy— lying on the ground, "passed out," and three or four fellows kicking at him. Baker testified that he went to the Highway Hotel with Jackman, as they were seeking a fellow employee by the name of Gomez; that they found Gomez who introduced them to Macias; that Macias asked for Jerkovich, saying he had some Mexican Nationals that he wanted to put to work; that he and Jackman then went after Jerkovich and returned about eight o'clock; that later he knocked a bottle of beer off the bar, whereupon Macias and a couple of other fellows— Mexicans—threw him out; that a few minutes later defendant and a "couple of guys" threw Jackman out, that several Mexicans followed and began fighting with him and Jackman; that he saw Macias with a club in his hands and saw him "swing at" Jackman; that after hitting the latter, defendant also hit Baker on the arm and hit a Mexican who was fighting him; that he did not remember much after that except that he was on the ground and they were kicking him.

Macias, testifying in his own behalf, asserted that Baker and Jackman were intoxicated, that Baker was making a disturbance and that it was Jerkovich and two other men who put him out; that Jackman, gritting his teeth, came up where Macias was sitting, whereupon Jerkovich asked him to get out, which Jackman did; that a woman who worked for him then told him that there was a fight outside, whereupon he looked out the window, then called the police; that Jackman, Baker

and Ayala were fighting and had "some sticks"; that he thought he would go out and see if he could stop the fight, so grabbed the club that he usually kept behind the bar in case he had to use it for "the right purposes," and went out; that Jackman was not there any more, but Baker was lying on the side of the curb and Ayala was pounding him with a stick —an iron bar; that he ordered Ayala to stop and when he did not he hit him over the shoulder and half the stick fell down; that Ayala said the other man had run away, so he picked up the stick and went after him; that he did not hit either Jackman or Baker. He also denied making the statements attributed to him. He admitted that he was 6 feet, 2 inches tall and weighed about 200 pounds. Jerkovich, called in rebuttal, denied that he put Jackman or Baker out.

One Henry Jordan, testifying for the defense, testified that he was present in the barroom and after Baker and Jackman had been put out and the door locked, the witness, Ayala and another person were about to leave when they encountered Baker and Jackman with iron bars in their hands; that Ayala grabbed Baker, but the witness ran upstairs onto a balcony, from which place he saw Jackman, Baker and Ayala wrestling over the bars; that Jackman hit Baker and Ayala and they fell down; that Ayala then hit Jackman with a bar; that Macias was not out there then; that when he came out Jackman was going down the street, and Ayala was hitting Baker across the head with a bar; that he saw defendant hit Ayala across the arm with the stick he held in his hand; that he did not see defendant hit Jackman.

One Lopez, the bartender for Macias, was also called for the defense, and testified that Baker knocked over some bottles of beer and that he fell to the floor and was then put out; that defendant was going to put him out, but the foreman (Jerkovich) said he would take care of him; that the foreman also put Jackman out, and the doors were again closed; that he heard noise outside, and the side door rattling, and later looked out the window and saw Jackman, Baker and Ayala fighting; that he called Mrs. Reyes to tell Macias that they were killing Ayala; that defendant went to the telephone and made a call, then grabbed a stick and went outside, while Lopez remained inside; that after about 10 minutes the police arrived, and they brought Ayala in with his face covered with blood, and with an iron stake in his hand; that he took the stake away from him and later gave it to the officers; that he

did not see any blood on the stake nor get any on his hands. He denied that defendant put either Baker or Jackman out, or touched either of them.

Mrs. Reyes, who was a cook at the hotel, said she saw three men fighting outside—Baker, Jackman and Ayala—after the bartender called her; that she called to defendant who went to the telephone, then told the bartender to open the door for him and he went outside; that she did not see anything in his hand.

The iron spikes or bars which were mentioned by some of the witnesses had apparently been taken from the truck used by Jerkovich, which was parked just outside the hotel. Both Jackman and Baker denied having them in their possession at any time.

Appellant's first assigned error is that the information was insufficient and that his demurrer thereto should have been sustained. The information read:

"Leo Macias is accused by the District Attorney for the said County of Merced, State of California, by this Information of the crime of a felony, to wit: a violation of Section 245 of the Penal Code of the State of California, committed as follows: The said Leo Macias, on or about the 30th day of October, 1945, at and in the said County of Merced, and State of California, and prior to the filing of this Information, did wilfully and unlawfully commit an assault upon the person of another, to wit: J. R. Jackman with a deadly weapon to wit: a wooden club."

The statute involved is section 245 of the Penal Code which reads: "Every person who commits an assault upon the person of another with a deadly weapon or instrument or by any means of force likely to produce great bodily injury is punishable," etc. Appellant argues that a wooden club is not a deadly weapon as matter of law; and that there being no allegation concerning the manner in which the club was used in this case, the information was insufficient; that a club is a deadly weapon only under particular circumstances and that the information failed to allege any such circumstances.

Section 952 of the Penal Code, as it now reads, after amendment in 1927 and 1929, provides that in charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical aver-

ments or any allegations of matter not essential to be proved. It may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused.

In *People* v. *Mitchell*, 40 Cal.App.2d 204, 208-210 [104 P.2d 545], the effect of the change in the language of said section 952 was discussed, and the court said that "it is now sufficient to plead the offense in the exact terms of the statute, and the accused is not entitled to a detailed allegation setting forth the particular circumstances. The accused is amply protected because he is legally entitled to a transcript of the testimony upon which the indictment or information is based." (Also see *People* v. *Pierce*, 14 Cal.2d 639, 644-646 [96 P.2d 784]; *People* v. *De La Roi*, 23 Cal.2d 692, 697 [146 P.2d 225, 151 P.2d 837]; *People* v. *Beesly*, 119 Cal.App. 82, 84-86 [6 P.2d 114, 970]; *People* v. *Silver*, 75 Cal.App.2d 1, 3-4 [170 P.2d 80].) Even before the amendments to section 952, *supra*, it had been held that an information which charged an "assault with a deadly weapon, to wit, a large shovel," was sufficient (*People* v. *Weir*, 10 Cal.App. 460 [102 P. 539]); and in the Weir case the case of *People* v. *Perales*, 141 Cal. 581 [75 P. 170], relied upon by appellant herein, was distinguished. Also see *People* v. *Savercool*, 81 Cal. 650 [22 P. 856].

Appellant's next contention is that the trial court erred in refusing to give an instruction on the subject of admissions, which was requested by him, and in giving one which, it is contended, is erroneous. The requested instruction reads: "An admission is the acknowledgment of the truth of some of the facts, constituting the alleged offense, and you are instructed that evidence of oral admissions of the Defendant must be received with caution." The one given states: "An admission is an acknowledgment of the truth of some facts constituting an alleged offense and, if you believe from the evidence in this case that the defendant has made some admission in this case tending to show his guilt of the offense charged, you may consider it as you would any other fact in the case and give it such weight as you deem proper."

Section 2061, subdivision 4, of the Code of Civil Procedure provides that a jury is to be instructed by the court on all proper occasions that the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral ad-

missions of a party with caution. Appellant in his brief and in his argument before this court placed particular reliance upon *People* v. *Koenig*, *(Cal.App.) 164 P.2d 923, in which the failure of the trial court to give an instruction that the testimony of defendant's oral admissions ought to be viewed with caution, was held to be reversible error. But that case has now been decided by the Supreme Court which held that while such cautionary instruction should have been given, in view of the record it was improbable that had it been given the jury would have discounted the testimony of the police officers as to defendant's admissions to such an extent that it would have returned a different verdict. We are of that opinion about the case before us. There is ample evidence to sustain the verdict without the testimony of Officer McDonald about defendant's admission that he struck Jackman. Jackman testified that defendant hit him over the head with the club, and it was obvious from Jackman's condition that he had been hit. Also there is evidence that there was fresh blood on the club, and it is not denied that defendant, with the club in his hand, pursued Jackman when the latter sought to escape from the scene of his injury and to conceal himself from his pursuer. It is also conceded that defendant armed himself with the club which he said he kept behind the bar for the "right purposes," and went out. And in view of the evidence that he had previously stated that he did not like the "white sons-of-bitches" anyway, the jurors were fully justified in believing that it was Jackman whom he hit with his club, and not Ayala as he claimed. One of the officers also testified that when they reached the place where Jackman was attempting to conceal himself under the car fender, defendant said, "I will kill the son-of-a-bitch."

██ Appellant next argues that the court misinstructed the jury on the principles of law pertaining to assault with a deadly weapon. The instruction given was:

"You are instructed, that an assault is an unlawful attempt, coupled with a present ability to commit a violent injury on the person of another.

"240 Penal Code.

"You are instructed, that in order to constitute the crime of assault with a deadly weapon, it is not necessary that the

---

*In *People* v. *Koenig* the Supreme Court granted a hearing on February 4, 1946. The decision of the Supreme Court is reported in 29 Cal.2d 87 (173 P.2d 1).

intended victim be seriously injured. The crime of assault with a deadly weapon may be committed without the intended victim having received any physical injury.

"If a person unlawfully attempts to strike another with a deadly weapon, and has a present ability to commit a violent injury on that person, the assault is completed.

"The unlawful attempt coupled with a present ability to commit a violent injury on the person of another constitutes the crime. In such a case the attempt has been made, coupled with a present ability to commit a violent injury within the meaning of the statute.

"It cannot be said that the ability to do the threatened act is wanting because the act was in some manner prevented.

"An assault cannot be made incomplete, merely because the intended victim resists and saves himself from injury or escapes."

Appellant's objections to this instruction are that it declares: That no physical injury need be shown, that the crime was committed although the complainant saved himself from injury or escaped, that the crime was committed though no blow was struck, and that it assumes that a club is a deadly weapon *per se* regardless of its use.

However, appellant fails to note other instructions given by the court at defendant's request, which read:

"I instruct you that whether the instrument alleged to have been used by the Defendant was or was not a deadly weapon is a matter of fact for you jurors to determine, and in determining whether or not an instrument is a deadly weapon you must take into consideration the manner of its use, the injuries inflicted by it, if any, the size and nature of the instrument and all the attendant circumstances."

"Every material element of the crime charged in the Information must be established beyond a reasonable doubt. In this particular charge there are three elements that must be proved by the Prosecution. These are:

"1. That the Defendant intended to assault the complaining witness, J. R. Jackman;

"2. That he did actually assault him;

"3. That he assaulted him with a deadly weapon;

"If any of these elements is not established to a moral certainty and beyond all reasonable doubt, you must acquit the Defendant."

In *People* v. *McCoy,* 25 Cal.2d 177, 190 [153 P.2d 315], one of the charges against defendant was an assault with a deadly weapon, of which charge he was found guilty. While the weapon in the case was a knife, there was no evidence that he inflicted any knife wounds upon the complaining witness, but he did threaten her with it, holding it near her face after he had knocked her down. The court said that while a knife is not an inherently dangerous or deadly instrument as a matter of law, it may assume such characteristics, depending upon the manner in which it is used. It quoted from *People* v. *Raleigh,* 128 Cal.App. 105 [16 P.2d 752], to the effect that when it appears that an instrumentality which is not a "weapon" in the strict sense of the word "is capable of being used in a 'dangerous or deadly' manner, and it *may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, we believe that its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion."* (Italics by the Supreme Court.) The court also said: "The trial court properly instructed the jury defining a deadly weapon (Pen. Code, § 245) and an assault in relation thereto (Pen. Code, § 240). In its charge on this phase of the case, the court stated that 'the intent or intention with which an act is done is manifest by the circumstances connected with the offense,' and it correlated therewith the 'present ability to commit a violent injury upon the person of another' as a matter for consideration in establishing the character of the instrumentality for the occasion in question. These were essential points for the jury's deliberation of the appellant's guilt of an assault with a deadly weapon. (*People* v. *Raleigh, supra,* at pages 109-110.) To warrant conviction of such offense it was not necessary that the prosecution introduce evidence to show that the appellant *actually made an attempt to strike or use the knife upon the person of the prosecutrix* (*People* v. *Bird,* 60 Cal. 7; *People* v. *Hunter,* 71 Cal.App. 315 [235 P. 67]), and the court properly refused the appellant's request to so instruct the jury."

Also see *People* v. *Freeman,* 86 Cal.App. 374, 376 [160 P. 826]; *People* v. *Raleigh, supra; People* v. *Peak,* 66 Cal.App.2d 894, 900 [153 P.2d 464].

Appellant further insists that the trial court invaded the province of the jury by instructing that an offense had been committed, when it instructed them as follows:

"It is impossible, of course, to read a man's mind as you would a book and thus determine his intention. You will, therefore, take into consideration in deciding this question all of the circumstances surrounding the commission of the crime, and the mental condition of the accused; for the law says, that the intent is manifested by the circumstances connected with the offense and the sound mind and discretion of the accused; but it also declares, that all persons are of sound mind who are neither idiots, lunatics, nor affected with insanity."

Appellant asserts that this instruction is a positive and unmistakable assumption and declaration that there was a "crime" and "an offense" committed; and that the jury therefore had no alternative but to convict. We think appellant reads more into the language of the court than is justified, and that the jury was not thereby instructed that defendant had committed a crime. See *People* v. *Ramirez,* 56 Cal. 533, 537 [38 Am.Rep. 73]; *People* v. *Besold,* 154 Cal. 363, 369-370 [97 P. 871]; *People* v. *Wilkins,* 158 Cal. 530, 536 [111 P. 612].

■ Next, appellant charges that the court invaded the province of the jury by assuming in its instructions that a deadly weapon was used, because it said:

"You are instructed, that in the offense of assault with a deadly weapon, an intent to use the deadly instrument may be implied from the manner of its use.

"If the act is wrongful and the use of the instrument under the circumstances is unlawful, the intent may be inferred from the method used, including the position of the parties and all of the surrounding circumstances.

"Where the act is both unlawful and wrongful, and well calculated to inflict serious personal injury, the law will imply an unlawful intention and override any actual intention existing in the mind of the aggressor."

"I instruct you that in this case, if you are convinced from the evidence beyond all reasonable doubt and to a moral certainty, that the defendant, Leo Macias, on or about October 30, 1945, did wilfully and unlawfully commit an assault upon the person of J. R. Jackman with a deadly weapon or instrument, and that such instrument when used in such manner was likely to produce death or great bodily injury, your verdict should be guilty."

Appellant says that these two instructions make the express assumption that there was a deadly weapon. But here appellant falls into the error of separating the charge to the jury into separate portions and considering each portion without relation to the charge as a whole. When it is considered in its entirety we think that appellant's said contention is unjustified.

Appellant's next assertion is that the court erred in refusing to instruct the jury that as a matter of law a club is not a deadly weapon, and that it should have given the following instruction proposed by defendant: "An instrument such as a stick or club is not a deadly weapon as a matter of law, and the presumption of innocence includes the presumption that it was not used as a deadly weapon. You must give the Defendant the benefit of this presumption." *People* v. *Lee,* 23 Cal.App.2d 168 [72 P.2d 572], is relied upon by appellant as authority for the requested instruction, but we find nothing in that opinion indicating that such an instruction was there given or requested. As hereinbefore stated, the court instructed the jury, at defendant's request, that whether or not the instrument alleged to have been used was a deadly weapon was a matter of fact for them to determine; also they were fully instructed on the presumption of innocence, in the language of section 1096 of the Penal Code. The instructions given sufficiently covered the subject. (See Pen. Code, § 1096a.)

Appellant next urges that the court erred in refusing to instruct the jury on the effect of legal presumptions, and in failing to give the following instruction requested by him: "A presumption may be controverted by other evidence, direct or indirect, but unless so controverted the jury are bound to find according to the presumption. In this case the defendant, Leo Macias, is presumed to be innocent of any crime and you must give this presumption full weight throughout your deliberation." The jury was instructed regarding the presumption of innocence, in the language of section 1096 of the Penal Code. That was sufficient. The giving of instructions couched in varying language but embodying the same principle of law is unnecessary. If the principle of law is once correctly stated, that is enough. In *People* v. *Kynette,* 15 Cal.2d 731, 757 [104 P.2d 794], it was said: "The first refused instruction concerned the presumption of innocence. This subject was adequately covered by the instruction given by the court, which

followed the language of section 1096 of the Penal Code. Section 1096a of the same code declares that no other instruction need be given on the subject." In *People* v. *Lew Fat*, 189 Cal. 242, 247 [207 P. 881], the court said: "The next group of his requested instructions which the defendant claims should have been given refer to the presumption of innocence to the benefit of which the defendant was entitled throughout his trial and up to the moment of the determination by the jury of his guilt or innocence. But an examination of the instructions which the court gave discloses that it covered the entire matter of these instructions with a clear, concise and correct charge. It was not required to repeat the rule in the more diffuse and amplified form of the defendant's requested instructions." (Also see *People* v. *Bickerstaff*, 46 Cal.App. 764, 775 [190 P. 656]; *People* v. *Wolfgang*, 192 Cal. 754, at p. 763 [221 P. 907], citing *People* v. *Bickerstaff*.)

▪ Another alleged error is the refusal of the trial court to instruct the jury on the definition of burglary, and in refusing to instruct them that "any person who attempts to enter a building with intent to commit any felony is guilty of a felony." The refusal to give such an instruction was entirely justified. Its possible application to any of the evidence in the case is so remote that the giving of same would only have tended to confuse the jury; and it had no relation to the issues. The urging of such an alleged error as ground for reversal of the judgment only tends to render questionable the faith of appellant's counsel in the merits of defendant's appeal by multiplying alleged errors; and, as said by the court in *United States* v. *Rowe*, 56 F.2d 747, 750, "set hurdles for the judge to leap." This one may be hurdled without further comment.

▪ Another assignment of error made by appellant is that the court erred in instructing the jury on the limitations of a police officer in using force to make an arrest without a warrant, it being argued that since there was no arrest by the officers without a warrant the instruction could only have reference to the conduct of the defendant; and that the sole inference that the jury could draw was that defendant, as a private person, had even less justification in making an arrest or using force without a warrant than a police officer had. While we do not see that the instruction was relevant, appellant's conclusion is unwarranted, and we are satisfied that defendant suffered no injury by the giving of same.

■ We are next importuned to reverse the judgment because of the alleged error of the court in instructing the jury on the duty of a tavern keeper to safeguard a guest. The instruction given reads: ''You are instructed that a patron of a restaurant or a place of business where beer or liquor is sold, is an invitee of the owner of the business, and the law imposes upon the owner of the business the duty of exercising ordinary care for the protection of the patron from injury.'' It is argued that this was prejudicial to defendant, as the rights of Jackman as a patron had no relevance to the question of assault, and its sole purpose was to imply to the jury that defendant was guilty of a wrong toward Jackman. Here, again, defendant overemphasizes the importance of the instruction. Even assuming that it was superfluous, it was equally subject to an inference that defendant was justified in striking Jackman in the exercise of his duty as owner to the other patrons of his business, if, as defendant appears to be contending, they were being menaced or assaulted by Jackman.

■ We are next urged to hold that the trial court committed reversible error in failing to instruct the jury of its own motion on included offenses, though appellant states that he did not request one and that his position throughout the trial was that the information was based on an alleged striking of Jackman with a club, and that defendant's position was simply that he did not strike Jackman. But he argues that the court, by other instructions given and previously discussed, raised the issue of simple assault and, therefore, should have submitted an instruction on it. This course of reasoning does not appeal to us as furnishing any ground for complaint. (See *People* v. *McCoy, supra,* at p. 195 thereof.)

■ Finally, appellant contends that the district attorney was guilty of prejudicial misconduct for two reasons. The first was because in cross-examining defendant's witness Jordan the following occurred:

''Q. By the way, where do you live?

''Mr. Galvin Jr.: Object to that as incompetent, irrelevant and immaterial.

''Mr. Adams: He asked him where he lived.

''The Court: Where the witness lives or where he was at that time? A. At that time?

"Mr. Adams: Now, where are you living now? A. Now in the County Jail now.

"Mr. Galvin Jr.: I object to this and assign it as prejudicial misconduct, as definitely an intentional act on the part of the District Attorney.

"Mr. Adams: I can find out where he lives, it is cross-examination.

"The Court: Let it stand as it is.

"Mr. Galvin Jr.: I will ask the Court to instruct the jury to disregard the testimony and admonish them that it has no bearing at all about the position of the defendant in this case.

"The Court: Well, of course, the jury will understand that,——

"Mr. Adams: It goes to his credibility.

"The Court: (continuing) the witness happens to be in jail has no bearing on this case.

"Mr. Galvin Jr.: Counsel stated it goes to the credibility of this witness, that is absolutely false.

"The Court: The question of course will have to go out and the statement disregarded.

"Mr. Galvin Jr.: Will the Court instruct the jury that it does not go to the credibility of the witness?

"The Court: No, it does not go to the credibility of the witness and should go out and should not be considered by the jury."

Subsequent questions developed the fact that Jordan had lived at the defendant's hotel for several weeks after the events charged in the information.

Appellant contends that the question asked by the district attorney was a deliberate attempt to degrade the witness and that the instruction of the court could not have had the effect of inducing the jury to disregard it; and that since the verdict is in conflict with Jordan's testimony, its rejection by the jury "is understandable only on the assumption that the witness was degraded in the jury's eyes by reason of the misconduct of the district attorney." In *People* v. *Roeder,* 41 Cal.App.2d 495, 501 [107 P.2d 92], the court said regarding a similar contention: "The question asked by the prosecution as to whether or not appellant slept in jails at San Diego and at Elsinore on the two nights prior to his return to San Bernardino in March of 1940 were not of sufficient importance to prejudicially affect appellant's substantial rights."

In addition to the foregoing claimed misconduct on the part of the district attorney it is contended that in his closing argument the district attorney was also guilty of prejudicial misconduct because he said: "This is a Mexican joint, down there——. . . . It was full of Mexicans that night and when these fellows were put out they were put out with this threat 'Let's finish them off.' '' Appellant's counsel argues that the "whole connotation of the District Attorney's remarks were (sic) obviously that the Highway Hotel was a disreputable place because frequented by Mexicans." That the place was frequented by Mexicans cannot be said to have been a misstatement or an unjustified comment. Defendant's own testimony was that they were entertaining that evening for some of the boys that were going back to Mexico; and there was other testimony showing that those present were mainly Mexicans. In his cross-examination of Jackman appellant's counsel brought out the fact that the people in the room were Mexican Nationals, including Macias, and that there were ten or twelve of them there. And Lopez, defendant's bartender, testified that beside Jerkovich and Jackman there was only one other American, the rest being Mexicans. But that fact could not in itself be said to cast a reflection upon the place. The only portion of the district attorney's statement which might be considered derogatory was the characterization of the place as a "joint." Webster's New International Dictionary defines "joint" used as slang as (a) "a gathering place; a hangout"; (b) "Loosely, any establishment, resort, dwelling, etc." As used in this sense we do not see that the remark of the district attorney was grossly improper or so far exceeded the realm of proper argument under the circumstances that it can be said to have prejudiced the rights of defendant. It must be obvious to any jury that district attorneys are not inclined to deal with defendants as paragons of virtue, and that counsel for defendants are accustomed to disparage witnesses for the prosecution. This case furnishes no exception, and we do not believe that the remark of the district attorney of which appellant complains can be said to have jeopardized the rights of defendant in view of the evidence in the case. (See *People* v. *Wiley,* 33 Cal.App.2d 424, 427-428 [91 P.2d 907]; *People* v. *Cherry,* 30 Cal.App. 285 [158 P. 335]; *People* v. *Hahn,* 58 Cal.App. 704, 709 [209 P. 268]; *People* v. *Reyes,* 133 Cal.App. 574, 577 [24 P.2d 531]; *People* v. *Frost,* 37 Cal.App. 120, 123 [174 P. 106]; *People* v.

*Fontes,* 110 Cal.App. 141, 143 [293 P. 835]. Also, this contention of appellant was argued on motion for a new trial and overruled. In *People* v. *Sarazzawski,* 27 Cal.2d 7, 15 [161 P.2d 934], the Supreme Court said that a trial judge is in a better position than an appellate court to determine the probable effect of misconduct of counsel, and his conclusion on that question will not be disturbed by an appellate court unless in the circumstances it is plainly wrong. And in *People* v. *Rickman,* 67 Cal.App.2d 711 [155 P.2d 374], it was stated: "Furthermore, the law is well settled that a judgment of conviction will not be reversed where the appellate court is unable to perceive that the alleged misconduct had a material effect on the determination of the issues of fact, or where it appears that the effect thereof was unimportant or slight; and especially is this true where as here the guilt of the accused has been established by clear and convincing evidence. In other words, a reversal is not warranted except in clear and extreme cases, and unless the misconduct is obviously so flagrant and prejudicial that in the opinion of the appellate court based on a review of the entire record, it has resulted in a miscarriage of justice. (8 Cal.Jur. 621; 4 Cal.Jur. 10-Yr. Supp. (1943 rev.) pp. 1006-1010.)"

 Finally, it is urged by appellant that the verdict is contrary to the evidence and contrary to law and resulted in a miscarriage of justice. In *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], the court said that a court on appeal will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt; that it is the function of the jury in the first instance and of the trial court, after verdict, to determine what facts are established by the evidence, and that before the verdict of the jury which has been approved by the trial court can be set aside on appeal upon the ground of insufficiency of the evidence "it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below."

We cannot say that upon no hypothesis is there sufficient evidence to support the conclusions of the jury and the trial court. On the contrary, there is ample evidence to support such conclusions, and it was for the jury to determine what

testimony it would believe and what it would reject. We have read the record carefully and it is our conclusion that such error as may have been committed did not interfere with the substantial rights of appellant or result in a miscarriage of justice. Under such circumstances, and particularly in view of the decision in *People* v. *Koenig, supra,* and the provisions of article VI, section 4½, of the Constitution, the judgment and the order denying a new trial should be, and they are hereby, affirmed.

Peek, J., and Thompson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 23, 1946.